IN THE UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF CONNECTICUT

| | |
|---|---|
| DAVID A. BECKERMAN,<br><br>               Plaintiff,<br><br>   - v -<br><br>M. HIDARY & CO., INC.<br><br>               Defendant.<br><br>M. HIDARY & CO., INC.,<br><br>               Third-Party Plaintiff,<br><br>   - v -<br><br>OFFICIAL STARTER, LLC,<br><br>               Third-Party Defendant. | DOCKET NO. 301 CV 2143 (SRU) |

**MEMORANDUM OF LAW
IN SUPPORT OF MOTION FOR
<u>SUMMARY JUDGMENT PURSUANT TO FED.R.CIV.P. 56</u>**

# TABLE OF CONTENTS

                                                                                           Page

TABLE OF AUTHORITIES ............................................................................................ ii

PRELIMINARY STATEMENT ....................................................................................... 1

STATEMENT OF FACTS ................................................................................................ 3

ARGUMENT ..................................................................................................................... 7

I.      ALL RIGHTS TO THE ROYALTIES WERE ASSIGNED TO
        STARTER PURSUANT TO THE ASSET PURCHASE
        AGREEMENT YEARS PRIOR TO BECKERMAN'S ASSIGNMENT ............... 7

II.     STARTER'S REJECTION OF THE LICENSING AGREEMENT
        RELIEVED HIDARY OF ITS OBLIGATIONS THEREUNDER ........................ 8

III.    STARTER WAIVED ITS RIGHT TO
        COLLECT UNDER THE LICENSING AGREEMENT ..................................... 12

IV.   THE CLAIM FOR ADVERTISING ALLOWANCE ......................................... 14

V.    THE MINIMUM GUARANTEE PAYMENT..................................................... 15

        CONCLUSION ................................................................................................... 16

## TABLE OF AUTHORITIES

**Cases**                                                                                                   Page(s)

A. Prete & Son Const. v. Town of Madison,
No. X05CV0172810S, 1994 WL 570243 (Conn. Super.Ct.) .....................................9, 10

Albany Ins. Co. v. United Alarm Services, Inc.,
194 F.Supp.2d 87 (D.Conn. 2002) ...............................................................................7

Bernstein v. Nemeyer,
570 A.2d 164 (Conn. 1990) .......................................................................................12

Bridgeport Jai Alai, Inc. v. Autotote Sys., Inc.,
215 B.R. 651 (Bankr. D.Conn. 1997) ..........................................................................9

Dichello v. Holgrath Corp.,
715 A.2d 765 (Conn. App.Ct. 1998)..........................................................................12

Fairchild Credit Corp. v. Donnelly,
158 Conn. 543, 264 A.2d 549 (1969) ..........................................................................8

Fishman v. SmartServe Online, Inc.,
No. X05CV0172810S, 2003 WL 536629 (Conn. Super.Ct.) .....................................10

Lavigne v. Hirsch,
114 F.3d 379 (2d Cir. 1997) ........................................................................................9

RLI Ins. Co. v. Hartford Accident & Indemnity Co.,
980 F.2d 120 (2d Cir. 2002).........................................................................................7

Shoreline Communications, Inc. v. Norwich Taxi, LLC,
70 Conn.App. 60, 797 A.2d 1165 (Conn. App.Ct. 2002) .............................................8

Statewide Grievance Comm. v. Brown,
786 A.2d 1140 (Conn. App.Ct. 2001)...................................................................12, 13

United Illuminating Co. v. Wisvest-Connecticut, LLC,
259 Conn. 665, 791 A.2d 546 (2002) ..........................................................................7

**Statutes**                                                                                          Page(s)

11 U.S.C. 365 ........................................................................................................... 9

11 U.S.C. 553 .......................................................................................................... 15


**Secondary Sources**

Restatement (Second) of Contracts § 241 (1981) ................................................. 10

IN THE UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF CONNECTICUT

| | |
|---|---|
| DAVID A. BECKERMAN,<br><br>Plaintiff,<br><br>- v -<br><br>M. HIDARY & CO., INC.<br><br>Defendant. | DOCKET NO. 301 CV 2143 (SRU) |
| M. HIDARY & CO., INC.,<br><br>Third-Party Plaintiff,<br><br>- v -<br><br>OFFICIAL STARTER, LLC,<br><br>Third-Party Defendant. | |

**MEMORANDUM OF LAW
IN SUPPORT OF MOTION FOR
<u>SUMMARY JUDGMENT PURSUANT TO FED.R.CIV.P. 56</u>**

<u>**Preliminary Statement**</u>

Third-party defendant Official Starter, LLC ("Official Starter") and defendant M. Hidary & Co., Inc. ("Hidary") respectfully submit this Memorandum of Law in support of their motion, pursuant to Fed. R. Civ. P. 56 for summary judgment.

Two and one half years after Starter Corp. ("Starter") filed for bankruptcy, sold all of its trademarks to Official Starter and rejected all license agreements concerning those trademarks, Starter's former founder and president, plaintiff David Beckerman, ("Beckerman") obtained an assignment of certain rights held by Starter. Beckerman

commenced this action against Hidary, a former licensee of Starter apparel, seeking to collect, inter alia, royalties paid by Hidary to Official Starter. Beckerman's claims must be dismissed.

First, the agreement pursuant to which Starter sold all of its trademarks to Official Starter, specifically assigned to Official Starter, all royalties concerning those marks as of the date of the transfer, i.e., July 29, 1999. As a result, Starter, and Beckerman as an assignee of its claims, have no rights to any royalties with respect to the Trademarks.

Second, the rejection of the licensing agreement between Starter and Hidary constitutes a material breach by Starter and relieved Hidary of any further obligations under that agreement. That breach, coupled with the sale of the trademarks by Starter to Official Starter, left Starter without any rights whatsoever to any royalties for sales after July 28, 1999.

Third, the plan administrator of the Starter bankruptcy was aware, not later than August 1999, that Hidary, subsequent to July 28, 1999, and pursuant to notice from, inter alia, Starter's designated agent, was paying royalties to Official Starter. By failing to take any action against Hidary or Official Starter for more than two years after learning this fact, Starter waived any rights that it might have had to pursue a claim against Hidary.

As an assignee of Starter, Beckerman has no greater rights than Starter would have had if there had been no assignment. Accordingly, and for the reasons set forth below, Beckerman's claims under the license agreement, must be dismissed.

2

## Background Facts

On or about May 7, 1997, Starter, as licensor, and defendant Hidary, as licensee, entered into a licensing agreement. (Weintraub Decl., Ex. A). Pursuant to the Licensing Agreement, Hidary was granted an exclusive license (the "License") to use certain Starter trademarks (the "Trademarks") in connection with Hidary's manufacture, sale and distribution of boy's and men's swimwear apparel products, as defined in the Licensing Agreement (the "Authorized Products"). The License was effective until December 31, 2000. (Weintraub Decl., Ex. A, ¶ 3.1). A June 1998 Addendum to the Licensing Agreement gave Hidary the right to use the Licensed Trademarks on active wear and school supplies. (Weintraub Decl., Ex. B). Simultaneously with the execution of the Addendum, Hidary advanced Starter $400,000 against future royalties. The May 7, 1997 agreement and the June 1998 Addendum are herein referred to collectively as the "Licensing Agreement."

Pursuant to the Licensing Agreement, Hidary agreed to pay Starter royalties of eight percent (8%) (the "Percentage Royalties") on all net sales by Hidary of Authorized Products bearing the Trademarks. (Weintraub Decl., Ex. A, ¶ 5.1). The Licensing Agreement also provides for its automatic termination "without any notice or action being required of Licensor or Licensee, if Licensor or Licensee files a petition in bankruptcy or is adjudicated bankrupt or insolvent. . . ." (Weintraub Decl., Ex. A, ¶ 18.1).

The Licensing Agreement further provides that, upon its termination, the licensee has a sell-off period of 120 days during which time it can dispose of Authorized Products in the regular course of business and is required to pay Starter royalties for Authorized

3

Products sold during that period. At the close of the 120 day period, Starter had the option to purchase the Authorized Products at the manufacturer's cost or to direct that they be destroyed. (Weintraub Decl., Ex. A, ¶ 20).

SoundView Licensing ("SoundView"), was retained by Starter as its agent to monitor the sales by and royalties due from its licensees, including Hidary, on sales of Authorized Products. In this regard, SoundView was specifically included as a party to the Licensing Agreement, as Starter's designated agent thereunder.

On April 19, 1999, Starter and its affiliates filed voluntary petitions for relief under Chapter 11 of the United States Bankruptcy Code, 11 U.S.C. § 101, *et seq.*, in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"). (Weintraub Decl., Ex. C, D and E).

On July 14, 1999, Starter entered into an Asset Purchase Agreement with New Starter, LLC ("New Starter") pursuant to which certain assets of Starter were sold to New Starter (the "Asset Purchase Agreement"). (Weintraub Decl., Ex. F). Section 2.2 of the Asset Purchase Agreement provides that all of Starter's licenses of the Trademarks and other agreements permitting third parties the right to use the Trademarks, except any agreements assigned to New Starter, were to be rejected by Starter pursuant to an order of the Bankruptcy Court or immediately upon the closing of the Asset Purchase Agreement. (Weintraub Decl., Ex. F, § 2.2). The Court approved that agreement on July 14, 1999 and, pursuant to § 9.1 thereof, the closing was held 15 days after such approval.

The Trademark Assignment Agreement annexed to and made part of the Asset Purchase Agreement as Exhibit E, and delivered on the closing date of July 29, 1999, provides in relevant part that:

4

> [Starter and its affiliates] hereby sell, assign, transfer, set over and deliver to [New Starter], [Starter's] entire right, title and interest in and to the [Trademarks], along with the goodwill of [Starter's] business in connection with which the [Trademarks] are used, free and clear of any Encumbrance, and assign to and authorize [New Starter] to file or prosecute in its name, applications, all countries, the same to be held and enjoyed by [New Starter], its successors, assigns, nominees or legal representatives, to the full end of the term or terms for which said [Trademarks] may be registered, as fully and entirely as the same would have been held and enjoyed by [Starter] had this assignment, sale and transfer not been made, **together with income, royalties, damages, or payments due on the date hereof [July 29, 1999] or thereafter**, including, without limitation, all claims for damages or payments by reason of infringement or unauthorized use of the [Trademarks], with the right to sue and collect for same for [Starter's] own use and enjoyment . . .

(Weintraub Decl., Ex. F) (emphasis added).

The Bankruptcy Court, by Order dated July 14, 1999, approved the Asset Purchase Agreement free and clear of all encumbrances. (Weintraub Decl., Ex. G). As a result, on July 29, 1999, all of the Starter trademarks and all rights therein, including royalties, were transferred to New Starter and Starter ceased to exist as an on-going entity. Simultaneously, Starter, pursuant to § 365 of the Bankruptcy Code, rejected the Licensing Agreement. (Weintraub Decl., Ex. F, § 2.2).

In a letter dated July 30, 1999, Parthenon Capital[1] notified Hidary that a new company known as Official Starter[2] had acquired the name and all of the trademarks of Starter. (Weintraub Decl., Ex. H). Hidary was further notified that the Licensing Agreement had been rejected by Starter in the bankruptcy proceedings, and that royalties

---

[1] Parthenon Capital was part of the consortium known as New Starter, LLC, which became Official Starter, LLC.

[2] To avoid confusion, all references hereinafter will be to Official Starter.

5

for any Starter products sold by Hidary on or after July 29, 1999, should be remitted to Official Starter. (Weintraub Decl., Ex. H).

In a memorandum dated August 8, 1999 (the "Memo"), SoundView notified all Starter U.S. licensees, including Hidary, that all royalties on shipments of Starter merchandise commencing after July 29, 1999, along with royalty reports, should be sent to Official Starter. (Weintraub Decl., Ex. I).

Pursuant to the instructions received from Parthenon and Soundview, Hidary sent to Starter its last monthly royalty report covering only the period July 1 – 28, 1999, together with a payment representing the balance due to Starter. (Weintraub Decl., Ex. J). In response to the aforementioned letter and memo from Parthenon and Soundview, respectively, Hidary paid royalties on its sales of Licensed Products after July 28, 1999, to Official Starter.

During the summer of 1999, Starter was involved in a lawsuit with SoundView's President, Don Stapleton. Not later than August 1999, Starter learned that Stapleton directed Starter's licensees to make the royalty payments for sales after July 29, 1999 to Official Starter. (Weintraub Decl., Ex. L, pp. 13 – 16, 39 - 40). Even though Starter knew that (a) the July statement covered only part of that month; (b) no statements or payments were received from Hidary after the July 1 – 28 statement and accompanying payment; and (c) its designated agent had directed Hidary to make all future royalty payments to Official Starter; at no time from the commencement of Starter's bankruptcy filing on April 19, 1999, through October 10, 2001, did Starter inform Hidary to make royalty payments to it for sales after July 28, 1999, or to cease and desist from making royalty payments to Official Starter.

By Order dated October 10, 2001, the Bankruptcy Court approved a quitclaim assignment to Beckerman of certain claims belonging Starter. (Weintraub Decl., Ex. K). Beckerman's assignment was the result of a settlement of his claims as a creditor of Starter. The assignment explicitly disclaimed any representation as to the validity of such claims.

On November 15, 2001, Beckerman commenced this action claiming that Hidary breached the Licensing Agreement by failing to pay Starter all Percentage Royalties, Minimum Guarantees and Promotional Fees due thereunder. (Weintraub Decl., Ex. M). Subsequently, Hidary commenced a third-party action against Official Starter, seeking indemnification for any sums it may owe Starter. (Weintraub Decl., Ex. N).

## Argument

### Point I

### All Rights To The Royalties Were Assigned To Official Starter Pursuant To The Asset Purchase Agreement Years Prior To Beckerman's Assignment

Beckerman's claim for royalties is contrary to the express terms and provisions of the Asset Purchase Agreement pursuant to which Starter sold and assigned all of its marks to Official Starter. As a result, Starter had no right to any royalties with respect to the marks. Accordingly, Beckerman, as an assignee of Starter, cannot recover royalties from Hidary.

"A contract is unambiguous when its language is clear and conveys a definite and precise intent." Albany Ins. Co. v. United Alarm Services, Inc., 194 F.Supp.2d 87, 92 (D. Conn. 2002) citing United Illuminating Co. v. Wisvest-Connecticut, LLC, 259 Conn. 665, 791 A.2d 546 (2002). "If the language of a contract is clear and unambiguous, the contract is to be given effect in accordance with its terms." RLI Insurance Co. v.

7

Hartford Accident and Indemnity Co., 980 F.2d 120, 122 (2nd Cir. 1992). Here, the Trademark Assignment Agreement delivered pursuant to the Asset Purchase Agreement transferred to Official Starter, on July 29, 1999, all of Starter's "right, title and interest in and to the [Trademarks] . . . together with income, royalties, damages or payments due on the date hereof or thereafter." (Weintraub Decl., Ex. F). Thus, pursuant to the plain meaning of that agreement, Starter relinquished <u>all</u> of its rights to royalties associated with the marks.

Beckerman, as assignee of Starter's claims, has no rights to these royalties. Beckerman, as assignee of Starter's claims, stands in the shoes of Starter, but "has no greater rights or immunities than the assignor would have had if there had been no assignment." Shoreline Communications, Inc. v. Norwich Taxi, LLC, 70 Conn.App. 60, 72, 797 A.2d 1165, 1172 (Conn. App. Ct. 2002) citing Fairchild Credit Corp. v. Donnelly, 158 Conn. 543, 552, 264 A.2d 547 (1969). Starter transferred to Official Starter all of its rights to collect royalty payments effective July 29, 1999. As a result, Beckerman had no right to collect these payments two and one-half years later. Accordingly, summary judgment is proper and Beckerman's claim should be dismissed.

## Point II

### Starter's Rejection Of The Licensing Agreement Relieved Hidary Of Its Obligations Thereunder

Starter's rejection of the Licensing Agreement constitutes a material breach that relieved Hidary of its obligations thereunder. As a result, Hidary, as a matter of law, is not responsible for the payment of royalties to Starter. Moreover, Beckerman, as assignee of Starter's claims, is afforded no more rights than Starter had. Accordingly, Beckerman cannot recover royalties from Hidary.

Bankruptcy Code section 365(g) addresses the effect of a rejection of a contract. Section 365(g) states in pertinent part that,

> Except as provided in subsections (h)(2) and (i)(2) of this section, the rejection of an executory contract of unexpired lease of the debtor constitutes a <u>breach</u> of such contact or lease
> (1) if such contract or lease has not been assumed under this section or under a plan confirmed under chapter 9, 11, 12, or 13 of this title, immediately before the date of the filing of the petition.

See 11 U.S.C. § 365(g). (Emphasis added). Thus, under section 365(g) if a contract is not previously assumed, rejection of the debtor's contract constitutes a breach. See 11 U.S.C. § 365(g); <u>Bridgeport Jai Alai, Inc. v. Autotote Sys., Inc.</u>, 215 B.R. 651, 657 (Bankr. D.Conn. 1997). Section 365(g) further provides that the date of the breach is set as of the day immediately <u>prior</u> to the debtor's bankruptcy filing. See 11 U.S.C. § 365(g). The breach does not make the contract disappear, but frees the estate from the obligation to perform. <u>Lavigne v. Hirsch</u>, 114 F.3d 379, 387 (2d Cir. 1997). Rejection gives rise to a remedy for breach of contract in the non-debtor party and is accorded the status of a pre-petition claim. <u>Id.</u> at 387.

In the event of a breach, state law determines a party's rights. <u>Id.</u> Connecticut law governs the Licensing Agreement. (Weintraub Decl., Ex. A, ¶ 26). Connecticut law provides that a party is relieved of continued performance under the contract when the other party's breach is material. See <u>A. Prete & Son Const. v. Town of Madison</u>, No. CV 91-03103073-S, 1994 WL 570243 at *14, (Conn. Super. Ct. 1994)("[i]t is not every dissatisfaction with a contract performance, nor even every breach – but only a material breach- that excuses performance by the other party") (citations omitted).

9

Under Connecticut law, "[a] substantive or material breach is one which touches the fundamental purpose of the contract and defeats the object of the parties in making the contract . . ." See Fishman v. SmartServe Online, Inc., No. X05CV0172810S, 2003 WL 536629 at *9, (Conn. Super. Ct. Feb 11, 2003)(citations omitted); A. Prete & Son Const., 1994 WL 570243 at *14 ("A material breach is one that has been defined as one that would justify the other party to suspend his own performance of the contract."). "[The standard of materiality of contractual breach] must be applied in light of the facts of each case in such a way as to further the purpose of securing for each party his expectation of an exchange of performance." Id. at *15 (citations omitted). Significantly, a material breach is one that is so important that it vitiates or destroys the entire purpose of the contract. Id.

Connecticut courts routinely look to the standards promulgated by the Restatement (Second) of Contracts § 241 (1981) to analyze the materiality of a breach. See Bernstein v. Nemeyer, 570 A.2d 164 (Conn. 1990); A. Prete & Son Const.,1994 WL 570243 at *14. These standards are:

> (a) the extent to which the injured party will be deprived of the benefit which he reasonably expected; (b) the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived; (c) the extent to which the party failing to perform will suffer forfeiture; (d) the likelihood that the party failing to perform or offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances; and (e) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing.

See Fishman, 2003 WL 536629 at *15; (citing Bernstein, 570 A.2d 164).

Here, the rejection of the Licensing Agreement and the resulting breach thereof constitutes a material breach of the agreement. Upon the rejection of the Licensing

10

Agreement, Starter was no longer the owner of the Trademarks it had licensed to Hidary. Pursuant to the July 14, 1999 Asset Purchase Agreement, Official Starter acquired all of the Trademarks from Starter effective July 29, 1999. (Weintraub Decl., Ex. F). Thus, after July 28, 1999, Hidary could no longer legally use the Trademarks as Starter's licensee. Moreover, any use of the Trademarks by Hidary after July 28, 1999 in the absence of consent by Official Starter, would constitute an infringement of the Trademarks. Thus, the very right that constituted the basis of the Licensing Agreement, i.e., use of the Starter Trademarks, was no longer available to Hidary.

Based on these undisputed facts, three prongs of the Restatement test are easily satisfied here. First, Hidary has been completely deprived of the entire benefit of the Licensing Agreement. Without a valid and enforceable agreement, Hidary could no longer use Starter's Trademark, vitiating the very purpose of the contract. Second, no compensation is adequate to remedy Hidary's injury. Without the Licensing Agreement, Hidary was unable to use Starter's Trademarks, resulting in the loss of its entire business operation that utilized the Trademarks.

Third, Starter could not cure its breach. The very intellectual property rights that are the subject matter of the Licensing Agreement, including the royalties thereunder, were sold to Official Starter. (See, Weintraub Decl., Ex. F). Moreover, simultaneously with that sale, Starter expressly rejected the Licensing Agreement as part of its bankruptcy liquidation and sale of its assets to Official Starter. Thus, Starter utterly deprived Hidary of the very basis of its bargain – the right to exploit a lawful license – and accordingly, Starter's rejection and resulting breach was material.

As a result of Starter's material breach, Hidary was relieved of any obligation under the Licensing Agreement, i.e., to pay royalties to an entity that had no rights to the

11

Trademarks or, indeed, to collect royalties thereon. Connecticut law is clear that when a party materially breaches a contract, the other party is excused from all obligations thereunder. Bernstein, 570 A.2d at 168 ("[i]t follows from an uncured material failure of performance that the other party to the contract is discharged from any further duty to render performances yet to be exchanged.") (citations omitted). Because Starter's breach was material, Hidary was not required to make any royalty payments on sales subsequent to the date of the breach and termination of the Licensing Agreement.

As set forth in Point I above, Beckerman, as assignee of Starter's claims, acquired no greater rights than Starter would have had if there had been no assignment. Accordingly, summary judgment is proper and Beckerman's claim should be dismissed[3].

### Point III

### Starter Waived Its Right To Collect Under The Licensing Agreement

By failing to take any steps to recover the royalties allegedly due from Hidary until November 15, 2001[4], Starter waived any right that it may have had -- and it had none -- to claim any entitlement to the royalties it now seeks. Waiver is the intentional relinquishment or abandonment of a known right or privilege. See Statewide Grievance Comm. v. Brown, 786 A.2d 1140 (Conn. App. Ct. 2001); Dichello v. Holgrath Corp., 715 A.2d 765, 770 (Conn. App. Ct. 1998). "Waiver involves the idea of assent, and assent is an act of understanding . . . Intention to relinquish must appear, but acts and conduct

---

[3] Even, if the Court finds that Starter was somehow entitled to collect royalty payments after it filed for bankruptcy, sold all of its Trademarks and rejected the Licensing Agreement, Starter would only be entitled to royalties for Authorized Products sold through August 19, 1999. The Licensing Agreement specifically restricts payments for the sale of Authorized Products to a 120 day period after termination. (Weintraub Decl., Ex. A, ¶¶ 18.1, 20). Therefore, at best, Starter would only be entitled to royalties for Authorized Goods sold by Hidary through August 19, 1999. Any royalty payments for sales made after that date were properly paid to Official Starter. Because Hidary continued to make royalty payments to Starter for Authorized Products sold through July 28, 1999, Starter would only be entitled to collect royalty payments for goods sold during the final 21 days remaining in the 120 day period.

12

consistent with intention to relinquish . . . are sufficient." <u>Statewide Grievance Comm.</u>, 786 A.2d at 1143. Waiver may be express or implied by a party's conduct and may be inferred from the circumstances if it is reasonable to do so. <u>Id.</u>

Here, Starter's conduct demonstrates that it waived its right to seek royalties under the Licensing Agreement. Simultaneously with the July 14, 1999 rejection and termination of the Licensing Agreement, Starter sold all of its interests in the Trademarks to Official Starter. During the pendency of the bankruptcy through July 28, 1999, Hidary made royalty payments to Starter pursuant to the Licensing Agreement. Starter readily accepted these payments, but never made any attempt to collect any amount allegedly owed for sales following the rejection of the Licensing Agreement.

In fact, even when, in August 1999, Starter learned that SoundView had directed that royalty payments for the period after July 29, 1999 be made to Official Starter, Starter, by its total silence over a two year period, consented to such payments. If Starter had any claim to royalties after July 28, 1999 --and it does not – it was required to inform Hidary of such a claim. Instead, Starter said and wrote nothing to Hidary even though it knew that: (a) SoundView had instructed Hidary to make royalty payments to Official Starter; (b) Hidary's royalty statement for July 1999 explicitly covered the period from July 1 – 28; and (c) Hidary sent no subsequent royalty statements or payments to Starter. Having waived its claim to any royalties, Beckerman, as assignee of Starter's claims, cannot recover the royalties from Hidary.

---

[4] Beckerman filed his Complaint on November 15, 2001.

13

## Point IV

### The Claim for Advertising Allowance

Beckerman seeks $53,401 for promotional advertising that Hidary "failed to do pursuant to the licensing agreement." This claim fails for two reasons:

1. Whatever rights existed in the Trademarks, including the right to collect for a shortfall in promotional advertising, was transferred to Official Starter (see Point I).

2. Under the License Agreement, Starter, by virtue of its rejection (i.e., breach) of the License Agreement, and sale of its assets to Official Starter, had no right to claim advertising payments; and

3. In fact, Hidary paid substantially more for advertising and promotion of the trademarks than the amounts required under the License Agreement.

The License Agreement (Weintraub Decl., Ex. A, ¶ 10.6) required Hidary to expend a certain minimum amount to "advertise and otherwise promote" sales of products bearing the Licensed Trademarks. Any shortfall ("deficiency") was to be remitted to the Licensor not to retain its treasury, but "to advertise, otherwise promote the sale of images of Authorized Products bearing the [licensed] Marks."

When asked in his deposition whether Starter did *any* advertising after July, 1999, Starter's former CFO and the bankrupt estate's plan administrator, Gary Letendre responded that "we had no right to advertise." (Weintraub Decl., Ex. L, p. 48). When then asked what business, if any, was Starter engaged in after July, 1999, Letendre's complete answer was "Liquidating assets." (Weintraub Decl., Ex. L, p. 49). Thus, Starter was unable to perform the acts required of it under ¶ 10.6 of the License Agreement.

14

Furthermore, Hidary expended substantially more for promotion and advertising of the Licensed Merchandised than the amounts acquired under the contracts. Beckerman's claim for any allowance is based on the disallowance by Joseph Formica of monies expended by Hidary for promotion of advertising. In part, these consisted of promotional subsidies given to reputable companies. For example, the credit given to Sears for advertising Licensed Merchandise was $88,600. (Weintraub Decl., Ex. P). In addition, Hidary expended thousands of dollars in promotional brochures distributed to its retail customers. Without anything to support his supposition that these Brochures were designed solely to assist Hidary sales representatives, these too were "disallowed" by Formica, the Starter accountant, who after Starter's demise (and like Letendre) was employed on a full time basis by a Beckerman owned company.

## Point V

## The Minimum Guarantee Payment

The final element of damages in the amount of $25,000 represents the minimum quarterly payment under the swimwear license. This claim was offset by a prepayment for active wear royalties in the amount of $400,000. Here there was a credit with respect to that prepayment in excess of the $25,000 claim. Set off of a claim by a bankrupt is allowed to the extent of valid claims against the bankrupt. (See, 11 U.S.C. § 553).

## Conclusion

For the foregoing reasons, it is respectfully submitted that the motion for summary judgment on behalf of Hidary and Official Starter be granted, along with such other and further relief as this Court may deem just and proper.

Dated:  New York, New York
        November 20, 2003

WACHTEL & MASYR, LLP

By: _____
    Evan S. Weintraub
Admitted Pro-Hac Vice
Attorneys for Third-party defendant
Official Starter, LLC
110 East 59th Street
New York, New York 10022
Tel. (212) 909-9500
CT 23444

GOODKIND LABATON RUDOFF
& SUCHAROW LLP

By: _____
    Edward Labaton
Admitted Pro Hac Vice
Attorneys for Defendant
M. Hidary & Co., Inc.
100 Park Avenue
New York, New York  10017
Tel. (212) 907 - 0700
CT 23784

16