CLERK
U.S. DISTRICT COURT
BRIDGEPORT, CONN.

FEB 26  4 30 PM '05

FILED

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| DAVID A. BECKERMAN,<br>　　　　　　　　Plaintiff,<br>v.<br>M. HIDARY & CO., INC.,<br>　　　　　　　　Defendant. | DOCKET NO.<br><br>3:01 CV 2143 (SRU) |
| M. HIDARY & CO., INC.,<br>　　　　　　　　Third-Party Plaintiff,<br>v.<br>OFFICIAL STARTER, LLC,<br>　　　　　　　　Third-Party Defendant. | February 26, 2004 |

### MEMORANDUM IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF CROSS MOTION FOR SUMMARY JUDGMENT

Plaintiff, David A. Beckerman, submits this memorandum of law in opposition to defendant, M. Hidary & Co., Inc.'s ("Hidary"), and third-party defendant, Official Starter, LLC's ("Official Starter"), motion for summary judgment and in support of his cross-motion for summary judgment. Plaintiff's cross motion for summary judgment should be granted because this court may determine, as a matter of law, that (1) pursuant to the July 14, 1999 Bankruptcy Court order approving the sale of assets to Official Starter, royalty rights on the License Agreement with Hidary were retained by Starter; (2) the rights to collect such royalties were transferred to David Beckerman under the October

10, 2001 Bankruptcy Order; and (3) Hidary either retained monies due Beckerman or, in error, paid the Starter royalties to Official Starter, in which case, Hidary has, as asserted herein, claims over against Official Starter.

Moreover, Hidary's Motion for Summary Judgment should be denied because:

(1) it misread and/or failed to consider footnote 1 of the July 14, 1999 Bankruptcy Order, which specifically excluded the existing License Agreements, including Hidary's, from the sale to New Starter. Thus, the monies due under the existing contracts remained part of the bankrupt estate ultimately transferred to Beckerman;

(2) to the extent defendant claims that the filing of bankruptcy excused it from performance, paragraph 18.1 of the License Agreement contains an agreed upon remedy in the event of a bankruptcy or cessation of business, which is the remedy sought here;

(3) Mr. Beckerman did not waive his rights to pursue Hidary for monies owed under the License Agreement having filed this action within five weeks of being assigned such rights in the Bankruptcy Court, nor could Mr. Letendre's conduct as Plan Administrator (which was reasonable in all regards) be construed to constitute a Beckerman waiver;

(4) the rights to collect advertising shortfalls were not assigned to Official Starter and Hidary is not entitled to a windfall; and

(5) Hidary's failure to assert an offset in the bankruptcy proceeding precludes it from asserting one here.

Mr. Beckerman is proceeding as the assignee of certain rights out of a bankruptcy proceeding (the "Starter Bankruptcy") involving his former company, The Starter Corporation ("Starter"). Beckerman was a principal creditor of Starter, having provided the company with a personal guarantee in the amount of $22 million. This action is Mr. Beckerman's attempt to recoup just a fraction of the $22 million.

Obviously, if we are correct in our reading of the documents and court orders, Hidary is not entitled to summary judgment and we are. For these reasons and those stated below, the court should deny defendant's motion for summary judgment and grant plaintiff's cross-motion for summary judgment.

## Background Facts

**A.      License Agreement**

On or about May 2, 1997, Starter entered into a License Agreement with Hidary that granted Hidary the right to use certain Trademarks of Starter in connection with its sale and distribution of apparel (the "License Agreement" or "Agreement"). Letendre Aff., Ex. A. The Agreement between Starter and Hidary was effective until December 31, 2000. Id. at ¶ 3.1. In June of 1998, the parties entered into an Addendum to the Licensing Agreement that provided Hidary the right to use the Trademarks on active wear and school products. Letendre Aff., Ex. B.

Pursuant to paragraph 5.1 of the License Agreement, Hidary agreed to pay Starter a royalty of eight percent on all net sales by Hidary of authorized products bearing the Starter Trademarks. Paragraph 10.6 of the Agreement further provided that Hidary was obligated to expend a sum at least equal to 2% of the greater of either projected or actual sales for any contract year for the promotion and advertising of the Trademarks. In the event that Hidary expended less than the minimum promotional fees, the Agreement required Hidary to pay the deficiency to Starter (the "Promotional Fees").

Paragraph 20 of the Agreement expressly provides for a runoff period in the event of termination, as follows:

> After termination or expiration of the license under the provisions hereof, Licensee, except as otherwise provided in this Agreement, may dispose of Authorized Products bearing marks covered by this Agreement which are in inventory or in process at the time notice of termination is received or upon the expiration date, whatever the case may be, for a period of one hundred twenty (120) days thereafter, on a non-exclusive basis, provided advance and Percentage Royalty payments are up-to-date for the current period and statements are furnished for that period in accordance with Section 5.4 and provided further that such items are disposed of only in the regular course of business and in accord with this Agreement as if it were not terminated or expired . . . . All applicable Percentage Royalties shall be paid on Authorized Products sold during the sell-off period within twenty-five (25) days following the expiration of said disposal period. . . . This Section shall survive the termination or expiration of this Agreement.

Plaintiff alleges that defendant failed to pay certain Percentage Royalties and promotional fees owed under the License Agreement for inventory on hand and in process following termination.

**B.    Starter Bankruptcy**

On April 19, 1999, Starter filed for bankruptcy protection in the United States Bankruptcy Court for the District of Delaware. Wyron Aff. ¶ 5, Ex. A. Paragraph 18.1 of the License Agreement contemplates that such a filing, or the cessation of Starter's business, would constitute a circumstance of termination, as follows:

> [T]his Agreement will terminate automatically, without any notice or action being required of Licensor or Licensee, if Licensee or Licensor files a petition in bankruptcy or is adjudicated a bankrupt or insolvent, makes any assignment for the benefit of creditors or any arrangement pursuant to any bankruptcy law, or discontinues its business, or if a receiver is appointed for licensee/Licensor or for Licensee/Licensor's business.

4

On July 14, 1999, Starter entered into an Asset Purchase Agreement with an entity known as New Starter, LLC and transferred certain of Starter's assets to New Starter on the closing date of July 29, 1999.[1] Letendre Aff., ¶ 7, Ex. C. The Asset Purchase Agreement was negotiated prior to confirmation of the Bankruptcy Plan. Letendre Aff. ¶ 8. In early negotiations of that Agreement, the parties contemplated that the purchaser would assume all license agreements, including the one that is the subject of this action. Letendre Aff. ¶ 9. During the negotiations, however, the Purchasers decided not to purchase the license agreements and asked that they be excluded from the sale. Letendre Aff. ¶ 10.

On or about July 14, 1999, the Bankruptcy Court approved the sale of certain of Starter's assets to Official Starter, subject to the terms of the Asset Purchase Agreement. Wyron Aff. ¶ 6, Letendre Aff. ¶ 11. The license agreements were not included in the final Asset Purchase Agreement confirmed by the bankruptcy court, nor were the rights to collect royalties thereon. Letendre Aff. ¶ 11, Exhibits C and D. Starter was permitted to use the trademarks for limited purposes following the closing, including for selling inventory at the Outlet stores and collecting royalties on the licensing agreements. Letendre Aff. ¶ 12-14.

In order to permit Starter and its licensees to sell inventory on hand and in process, and to collect royalties thereon, the bankruptcy court approved a Non-Exclusive License Agreement between Starter and New Starter to allow Starter

---

[1] For purposes of this action, "New Starter" and "Official Starter" refer to the same entity that purchased the Starter Trademarks out of the Starter Bankruptcy.

continued use of the trademarks for this limited purpose. Letendre Aff. ¶ 13, Ex. E. The Second "WHEREAS Clause" in the Non-exclusive license expressly defines "permitted uses" to include, among other things,

> the sale of certain goods currently in Licensees' inventory, goods which the Licensees are contractually obligated to purchase, **work in process**, goods which are validly returned to Licensees **and other assets of Licensees' which are not included in the Purchased Assets (as defined in the Purchase Agreement)** . . .

(emphasis added). Id. This Non-Exclusive License Agreement to Starter also had a term of two years, meaning the parties thought it reasonable to expect that it would take at least two years for Starter to collect receivables and wind up its affairs. Id.

Hidary did not make any payments of royalties to Starter for any sales of inventory on hand or in process at the time of the sale of the trademarks. Letendre Aff. ¶ 23. Hidary also failed to pay for its advertising shortfalls under the License Agreement following Starter's filing of bankruptcy. Letendre Aff. ¶ 24.

On October 10, 2001, the right to collect royalties due on the licensing agreements including the License Agreement with Hidary was transferred to David Beckerman in settlement of his claims against the bankruptcy estate. Wyron Aff. ¶ 8, Ex. C, Letendre Aff. ¶ 20, Ex. F. David Beckerman's status as a creditor was based on his execution of a personal guarantee of $22 million to Starter. Letendre Aff. ¶ 21. On November 14, 2001, Beckerman filed this lawsuit against Hidary, within five weeks of being assigned the rights to collect royalties on the License Agreements. See Complaint.

6

## Argument

**I.    Standard for Determining Motion for Summary Judgment**

Summary judgment is appropriate only if the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits show that there is no genuine issue of material fact. Fed.R.Civ.P. 56(c); *see also* <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986). "The burden is on the moving party to demonstrate the absence of any material factual issue genuinely in dispute." <u>AIG, Inc. v. London Am. Int'l Corp., Ltd.</u>, 664 F.2d 348, 351 (2d Cir. 1981) (*quoting* <u>Heyman v. Commerce & Indus. Ins. Co.</u>, 524 F.2d 1317, 1319-20 (2d Cir. 1975)). In determining whether a genuine issue has been raised, the court must resolve all ambiguities and draw all reasonable inferences against the moving party. *See* <u>United States v. Diebold, Inc.</u>, 369 U.S. 654, 655 (1962); <u>Quinn v. Syracuse Model Neighborhood Corp.</u>, 613 F.2d 438, 445 (2d Cir. 1980).

Here, because there are no material issues of fact as to the proper reading of the bankruptcy orders and pertinent agreements, plaintiff's cross-motion for summary judgment should be granted. At the very least, if the court disagrees with the plaintiff's reading of the Documents, the court must deny defendant's motion for summary judgment.

**II.    The Bankruptcy Documents Read Together With The Asset Purchase Agreement Demonstrate That The Right To Collect Royalties For Inventory On Hand Or In Process Was Not Assigned to Official Starter.**

The Royalties due under the Agreement were not assigned to Official Starter under the Asset Purchase Agreement. In fact, Official Starter had the opportunity to assume the licenses, but expressly declined to do so. Letendre Aff ¶ 9-10. To the

extent defendants claim otherwise, they have simply misread, or have failed to consider at all, the bankruptcy order approving the purchase of assets out of the Starter Bankruptcy.

The Bankruptcy Order approving the Asset Purchase Agreement expressly excluded the royalties due under the license agreement between Starter and Hidary. Letendre Aff ¶11, Ex. D. It provides in footnote 1 that "For purposes of this Order 'Purchased Assets' shall not include the items listed in clauses (a), (b) and (f) of the definition of Purchased Assets in the Asset Purchase Agreement". (Id.). Sections (a), (b) and (f) appear in Section 1.1, at pages 4-5, of the Asset Purchase Agreement and expressly reference the licenses and royalties receivable, as follows:

> **"Purchased Assets"** means all of the Sellers' right, title and interest as of the Closing Date in and to the following:
>
> (a) the Assigned Contracts;
> (b) all claims or causes of action of the estates of Sellers related to the licenses of the Trademarks...;
> (c) the Royalties Receivables".

Letendre Aff., Ex. D, p.4

In the same section, "Royalties Receivables" is defined as "the royalties receivable as of the date hereof which are directly related to the licenses of Trademarks included in the Assigned Contracts". Letendre Aff., Ex. D, p.5. The Assigned Contracts included the License Agreement with Hidary. Letendre Aff. ¶ 7. Thus, it is clear that royalties due under the License Agreement between Starter and Hidary were <u>not</u> included in the rights assigned to Official Starter. The Asset Purchase agreement, as approved by order of the bankruptcy court, only conveyed future rights to collect

8

royalties based on the Trademarks that were purchased by Official Starter and would be subject to new license agreements entered into by Official Starter.

In order to allow for runoff sales of inventory on hand and in process under the existing licenses, the bankruptcy court approved a non-exclusive license agreement between New Starter and Starter, the effect of which was to confirm that the bankrupt estate had the right to use the licenses for sell-off of inventory and collection of royalties. Letendre Aff. ¶ 11-14, Ex. E, p.1. This license to Starter was operative for a two-year term. Id. at ¶ 6. Thus, the parties contemplated that Starter would collect royalties due on existing licenses, and that two years was a reasonable period of time for such an effort. Another indication that Official Starter declined to assume the licenses is evidenced by the fact that the Assignment and Assumption Agreement appearing as part of Exhibit E to the Asset Purchase Agreement was crossed out and never signed. Letendre Aff., ¶ 10, Ex. C.

Accordingly, based on the Bankruptcy Order approving the sale of assets to Official Starter, this court may decide, as a matter of law, that Starter retained the rights to the royalties under the License Agreement with Hidary. Beckerman, through his assignment from Starter out of the bankruptcy, is entitled to such royalties for all goods on hand or in process at the time of the bankruptcy.

### III. Starter's Rejection of the License Agreement did Not Relieve Hidary of Its Obligation to Pay Royalties to Starter

Hidary claims that Starter's so-called "rejection" of the licensing Agreement in bankruptcy court constitutes a material breach of the agreement that relieves Hidary of

further performance.  This entire argument is wide of the mark and a red herring. Plaintiff submits that this court may decide, as a matter of law, (1) that there was no breach, (2) even if "rejection" might in some instances be characterized as a "breach", where as here, the parties have agreed in the underlying agreement to appropriate remedies in the event of a bankruptcy, those remedies must be enforced by the court, and (3) even if no remedies were provided, any breach was not material.  If Hidary were right, it would receive all of the benefits of the contract – namely sales proceeds from the use of the Trademarks, without paying the Licensor the royalties on those sales. That is most certainly not what was contemplated by the License Agreement.

First, paragraph 18.1 of the Agreement expressly provides that the Agreement shall terminate if Starter "discontinues its business."  Thus, entirely apart from any bankruptcy filing, the run-off remedies apply because Starter discontinued its business. Defendant cannot claim here that the bankruptcy "rejection" principles even apply.

Second, even if the court considers this situation to involve a so-called "rejection" of licenses, the parties agreed on the run-off remedies that apply.  Connecticut law determines the parties' rights in the event of a breach of contract due to rejection of a contract.  In re Lavigne, 114 F.3d 379, 386 (2nd Cir.1997).  Under Connecticut law, "[p]arties to a contract may agree on the remedies available in the event of a breach of contract."  International Marine Holdings, Inc. v. Michael F_____ et. al., 44 Conn. App. 664, 676 (1997); Shawmut Bank Connecticut, N.A. v. Connecticut Limousine Service, Inc., 40 Conn. App. 268, 277 (1996), cert. denied 236 Conn. 915.  "If the language of the agreement discloses that the parties intended to limit the remedies to those stated,

10

the agreement will be enforced and the party will be limited to the exclusive remedies outlined in the agreement . . ." <u>International Marine Holdings, Inc. v. Michael F. Stauff et. al.</u>, 44 Conn. App. 664, 676 (1997).

These basic principles are not affected by the operation of the bankruptcy code. <u>In re Bridgeport Jai Alai, Inc. v. Autotote Systems, Inc.</u>, 215 B.R. 651, 654 (1997). "Under federal law, a debtor in possession, subject to the court's approval, may assume or reject any executory contract of the debtor." <u>Id</u>. at 657. "The main purpose of Section 365 [of the Bankruptcy Code] is to allow a debtor to reject executory contracts in order to relieve the estate of burdensome obligations while at the same time providing a means whereby a debtor can force others to continue to do business with it when the bankruptcy filing might otherwise make them reluctant to do so." <u>Id</u>. "If the contract has not been previously assumed, rejection of the debtors' executory contract constitutes a breach of the contract. While rejection is treated as a breach, it does not completely terminate the contract." <u>In re Lavigne</u>, 114 F.3d 379, 386 (2nd Cir.1997). Thus, "rejection merely frees the estate from the obligation to perform; it does not make the contract disappear." <u>Id.</u> Accordingly, the remedies provided for in the contract after termination remain in full force and effect.

Third, even if the court were to consider materiality, the court may decide, as a matter of law, that such rejection was not a material breach under the circumstances of this case principally because the parties contemplated the very bankruptcy scenarios that occurred and the remedies that would flow therefrom. Not every breach by one party to a contract relieves the duty of performance of the other party, but rather it must

be a material breach. <u>A. Prete & Son Construction v. Madison</u>, 1994 WL 570243 *14 (Conn. Sup. 1994). The breach must be so "important that it vitiates or destroys the entire purpose for entering into the contract." <u>Id</u>. at *15.

The Connecticut Supreme Court has approved the multifactor standards for determining materiality of a breach contained in § 241 of the Restatement (Second) of Contracts. <u>Bernstein v. Nemeyer</u>, 213 Conn. 665 (1990). This test provides that in determining whether a failure to render or to offer performance is material, the following circumstances are significant:

> (a) the extent to which the injured party will be deprived of the benefit which he reasonably expected; (b) the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived; (c) the extent to which the party failing to perform or to offer to perform will suffer forfeiture; (d) the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances; [and] (e) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing. 2 Restatement (Second) § 241; <u>Strouth v. Pools by Murphy and Sons, Inc.</u>, 79 Conn.App. 55, 59 (2003)

"The standards of materiality are to be applied in light of the facts of each case in such a way as to further the purpose of securing for each party his expectation of an exchange of performances." <u>Strouth v. Pools by Murphy and Sons, Inc.</u>, 79 Conn.App. 55, 60 (2003). "If a breach is immaterial, the existing rights of the parties do not change. The contract remains enforceable although the breach may occasion liability for damages." <u>A. Prete & Son Construction v. Madison</u>, 1994 WL 570243 *15 (1994).

Having contracted for run-off remedies as a result of the filing of bankruptcy, defendants cannot now claim that such a filing constituted a material breach.

Moreover, while Hidary claims some impediment caused by the so-called breach, it readily admits that it continued to sell goods bearing the Starter trademark. The only difference, following the rejection, was that Hidary no longer made royalty payments to Starter. Hidary wants to have it both ways. On the one hand, it claims that it was prevented from using the trademarks and, therefore, should not have to pay royalties to Starter. On the other hand, it continued to sell goods with the trademark and profited therefrom. The breach that the defendant complains about can hardly be material, if it had minimal effect on Hidary's benefits under the contract.

Under the materiality test set out in the Restatement, Hidary was not deprived of the benefit which it expected under the contract as it continued to sell Starter goods after the breach; any alleged injuries could easily be compensated with money damages; Starter had already fully performed; and Starter acted in good faith considering that the rejection was occasioned by the bankruptcy proceeding. Any alleged breach by Starter should not relieve Hidary of its obligations to make such payments. Otherwise, Hidary would enjoy a windfall.

Moreover, Hidary's obligations during the runoff period, by the express terms of the contract, survive termination. Section 20 of the License Agreement provides, in relevant part, that Starter is entitled to receive royalty payments for goods sold in the sell off period and that this right survives "termination or expiration of the agreement". Letendre Aff., Ex. A.

Hidary's fall back position that it only owes royalties through August 19, 1999 is likewise flawed. While Hidary is correct that there was a 120 day sell off period, such period would not have commenced until the date of rejection of the contract on July 29, 1999. Moreover, Hidary was required at the end of the 120 day period to either return all unsold goods to Starter or destroy such goods. Letendre Aff., Ex. A, ¶ 20. Nowhere in the License Agreement does Hidary have the right to continue to sell Starter goods beyond the 120 day mark and keep the profits made thereon. Not only did Hidary breach the License Agreement by continuing to sell Starter licensed inventory after such date, but it failed to pay royalties on such sales to Starter. No reasonable interpretation of the License Agreement would permit such a windfall.

## IV.    Beckerman Never Waived His Rights to Collect Royalty Payments

Waiver is a knowing and intentional relinquishment of a known right. Statewide Grievance Comm. V. Brown, 67 Conn. App. 183, 188 (2001) cert. denied, 259 Conn. 919; Soares v. Max Services, Inc., 42 Conn. App. 147, 175, (1996) *cert. denied*, 239 Conn. 915 (1996). "Whether a waiver has occurred" in a particular case "is a question of fact". Statewide Grievance Comm. V. Brown, 67 Conn. App. 183, 188 (2001). The court may decide, however, based on the facts presented that the elements of waiver are not present and that the claim has no merit.

Beckerman never waived his rights to collect royalties owed under the License Agreement with Hidary. Beckerman was not assigned the rights to collect royalties owed by Hidary to Starter until October 10, 2001. Beckerman filed the present complaint on November 15, 2001. Certainly, Beckerman could not have asserted such

14

rights before he was given those rights in the bankruptcy court. Regardless, the mere lapse of time does not constitute a waiver under these circumstances, especially considering that the plaintiff filed his complaint within five weeks of being assigned such rights.

Hidary claims that Starter should have taken active steps to inform Hidary that it had to continue to comply with the terms of the License Agreement. This argument is specious. Hidary was certainly aware of the terms of the License Agreement and it was aware of the bankruptcy orders issued in the Starter Bankruptcy. Hidary was involved in the bidding process for Starter's assets. Slossberg Aff. Ex. A, p. 140, 143. As discussed above, the bankruptcy order approving the Asset Purchase Agreement excluded the License Agreement and royalties from the assets transferred to Official Starter.

Moreover, defendant's reliance on supposed instructions from Soundview to pay royalties to Official Starter is unavailing. Soundview was discharged as Starter's agent by order of the Bankruptcy Court effective July 29, 1999. Letendre Aff., ¶ 25, Ex. G. Hidary was a participant in the bankruptcy proceeding. Thus, Hidary knew, or should have known, that Soundview was not Starter's authorized agent.

Additionally, the Plan administrator had more pressing issues than chasing Hidary for overdue royalty payments. Letendre Aff. ¶ 22. He had to prioritize substantial collection efforts on a variety of estate assets. In addition, the Non-Exclusive License Agreement to Starter provided for at least a two-year period in which to conduct runoff operations. Therefore, there was no intent to relinquish rights, but

rather to preserve them. The two year term expired just several months prior to institution of this action. And after the rights to collect such royalties were assigned to Mr. Beckerman, he promptly made demand for such overdue payments. When Hidary refused, the present lawsuit was filed in a timely manner, well within the statute of limitations.

## V. Beckerman Is Entitled to Any Advertising Shortfall Under the Agreement

Defendant claims that it should not be required to pay for its shortfall of promotional fees under the Agreement because of the transfer of the Trademarks to Official Starter and Starter's rejection of the License Agreement in the Bankruptcy. As discussed above (supra at sections II and III), the premise of this claim is mistaken.

Hidary's additional claim that it paid "substantially more for advertising and promotion of the trademarks than the amounts required under the License Agreement" is equally flawed. Plaintiff's right to advertising shortfalls is found in paragraph 10.6 of the Agreement:

> In the event that such deficiency occurs, or is discovered in the final Contract Year, or after the termination or expiration of this Agreement, then such funds may be used by Starter to advertise or otherwise promote any products associated with the Marks. Letendre Aff., Ex. A ¶ 10.6.

Once the contract was terminated, there was no requirement that funds received from Hidary on account of a deficiency be used by Starter for any particular purpose.

The fundamental flaw in Hidary's argument is that the subject payments were due <u>before</u> the rejection of the License Agreement and sale of the trademarks. Thus, Hidary is attempting to benefit by its own delay in paying. Surely, this was not the

intent of the Bankruptcy Order and Hidary should not be permitted to benefit from its own breach of the License Agreement.

The Defendant's fall back position that Hidary paid substantially more for advertising than the amounts required under the License Agreement is inconsistent with the express terms of the contract. Plaintiff's accountant determined, following an audit, that Hidary had not in fact spent the required amounts based on the amount of sales reported by Hidary. The Agreement is clear that money spent on Trade Shows and promotional materials for salespeople does not count towards satisfying the required advertising expenditures. Letendre Aff., Ex. A ¶ 10.6. At the very least, there is a factual dispute concerning the amount of qualified advertising expenditure that Hidary made that cannot be resolved on a motion for summary judgment.

## VI.    Hidary's Failure to Assert an Offset in the Bankruptcy Court Compels Rejection of Its Offset Claim Here.

The Defendant admits that there was a prepayment of $25,000.00 due under the License Agreement on July 1, 1999. Further, Hidary admits that no such payment was made. Despite these facts, Hidary claims that this prepayment should be offset by a prepayment for active wear royalties made on a different licensing agreement for Swimwear. Neither of the agreements between Hidary and Starter allow for an offset between the agreements. Any claim for setoff by Hidary should have been made in the context of the Bankruptcy proceeding. By failing to timely assert such a claim in the bankruptcy proceeding, such claim was waived. See In Re Britton, 83 BR 914 (1988).

## VII. Conclusion

For the reasons stated above, the court should grant plaintiff's cross motion for summary judgment and deny defendants' motion in its entirety.

THE PLAINTIFF, DAVID A. BECKERMAN

By: _____
J. Daniel Sagarin, CT02489
David A. Slossberg, CT13116
Brian C. Fournier, CT 16272
Hurwitz & Sagarin, LLC
147 N. Broad Street
Milford, CT 06460
Telephone: 203-877-8000

## CERTIFICATE OF SERVICE

This is to certify that on February 26, 2004, a true and correct copy of the foregoing was mailed, first class mail, postage prepaid, to:

Evan S. Weintraub, Esq.
Wachtel & Masyr, LLP
110 East 59th Street
New York, NY 10022

Edward Labaton, Esq.
Goodkind Labaton Rudoff
 & Sucharow LLP
100 Park Avenue
New York, NY 10017

Elizabeth A. DiRusso
Wallman & Dirusso, LLC
Official Starter, LLC
750 Summer Street
Stamford, CT 06901

Brian C. Fournier