# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................................ ii

PRELIMINARY STATEMENT ..........................................................................................1

ARGUMENT .........................................................................................................................4

I.    ALL RIGHTS TO THE ROYALTIES WERE ASSIGNED TO
STARTER PURSUANT TO THE ASSET PURCHASE
AGREEMENT YEARS PRIOR TO BECKERMAN'S ASSIGNMENT...............4

II.    STARTER'S REJECTION OF THE LICENSING AGREEMENT
RELIEVED HIDARY OF ITS OBLIGATIONS THEREUNDER ........................8

III.    STARTER WAIVED ITS RIGHT TO
COLLECT UNDER THE LICENSING AGREEMENT......................................10

IV.    THE CLAIM FOR ADVERTISING ALLOWANCE ..........................................13

CONCLUSION ...................................................................................................15

# TABLE OF AUTHORITIES

**Cases**                                                                                                         Page(s)

<u>A. Prete & Son Const. v. Town of Madison</u>,
No. X05CV0172810S, 1994 WL 570243 (Conn. Super.Ct.) ........................... 8

<u>Bank of Boston v. Scott Real Estate, Inc.</u>,
40 Conn.App. 616, 673 A.2d 558 (Conn. App. 1996) ..................................... 6-7

<u>Bernstein v. Nemeyer</u>,
570 A.2d 164 (Conn. 1990) ...............................................................................10

<u>Bridgeport Jai Alai, Inc. v. Autotote Sys., Inc.</u>,
215 B.R. 651 (Bankr. D.Conn. 1997) ..................................................................8

<u>Components Direct, Inc. v. European American Bank and Trust Co.</u>,
175 A.D.2d 227, 572 N.Y.S.2d 359 (2d Dep't 1991)...........................................6

<u>Fairchild Credit Corp. v. Donnelly.</u>,
158 Conn. 543, 264 A.2d 549 (1969) ................................................................12

<u>Metropolitan Life Insurance Co. v. RJR Nabisco, Inc.</u>,
906 F.2d 884 (2d Cir. 1990) ................................................................................5

<u>RLI Ins. Co. v. Hartford Accident & Indemnity Co.</u>,
980 F.2d 120 (2d Cir. 2002).................................................................................5

<u>Shoreline Communications, Inc. v. Norwich Taxi, LLC</u>,
70 Conn.App. 60, 797 A.2d 1165 (Conn. App.Ct. 2002) ..................................12

<u>Statewide Grievance Comm. v. Brown</u>,
786 A.2d 1140 (Conn. App.Ct. 2001)................................................................11

IN THE UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF CONNECTICUT

| | |
|---|---|
| DAVID A. BECKERMAN,<br><br>      Plaintiff,<br><br>- v -<br><br>M. HIDARY & CO., INC.<br><br>      Defendant.<br><br>M. HIDARY & CO., INC.,<br><br>      Third-Party Plaintiff,<br><br>- v -<br><br>OFFICIAL STARTER, LLC,<br><br>      Third-Party Defendant. | DOCKET NO. 301 CV 2143 (SRU) |

**MEMORANDUM OF LAW IN FURTHER SUPPORT OF MOTION
FOR SUMMARY JUDGMENT AND IN OPPOSITION TO
<u>PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT</u>**

**<u>Preliminary Statement</u>**

In our moving papers, defendant M. Hidary & Co., Inc., ("Hidary") and third-party defendant Official Starter, LLC ("Official Starter") demonstrated that the clear and unequivocal language contained in the agreement pursuant to which Starter Corporation ("Starter") sold its assets, including the trademarks licensed to Hidary, to Official Starter, specifically included an assignment to Official Starter, of all royalties concerning those marks as of the date of the transfer, i.e., July 29, 1999. That assignment explicitly gave to Official Starter the right to collect all royalties and other payments due by any licensee

of the marks on or after July 29, 1999.  As a result, Starter, and Beckerman as an assignee of its claims, have no rights to any royalties with respect to those trademarks.

In his opposition papers, Beckerman ignores the clear and unequivocal language of the Trademark Assignment Agreement (the "Trademark Assignment") and instead argues that the exclusion of the license agreements from the list of Starter assets purchased by Official Starter coupled with a Non-Exclusive License Agreement somehow gave Starter the right to pursue royalties from former licensees.  He makes the absurd claim that the granting to Starter of a limited license, which would permit it to sell off its existing inventory, negated the Trademark Assignment and revived the very rights assigned to Official Starter simultaneously with the granting of the Non-Exclusive License.

That claim is more than disingenuous.  The Trademark Assignment approved by the Bankruptcy Court and signed on July 29, 1999 clearly states that (a) all rights in the Trademarks licensed to Hidary are transferred to Official Starter, and (b) Official Starter was given the right to "all income, **royalties**, damages or payments due" on and after July 29, 1999.

The Non-Exclusive License Agreement which was approved by the Bankruptcy Court in the same Order that approved the Trademark Assignment was explicitly for the limited purpose of permitting Starter "in the operation of its discount outlet stores and to sell off its existing inventory."  Nothing – absolutely nothing – in the Non-Exclusive License to Starter negated the express assignment to Official Starter of **all** rights in the Marks to Official Starter; nothing negated the right expressly granted to Official Starter to collect all income, royalties and other payments attributable to the Marks due on and

after July 29, 1999.  Nothing gave back to Starter what it relinquished when it signed the Trademark Assignment on July 29, 1999.

While we are confident that the Trademark Assignment is dispositive, we also demonstrated that even if there was no explicit assignment, Summary Judgment should be granted.

Starter's bankruptcy and subsequent rejection of the licensing agreement with Hidary constituted a material breach by Starter and relieved Hidary of any further obligations under that agreement.  Furthermore, by failing to take any action against Hidary or Official Starter for more than two years after learning that Hidary was paying royalties to Official Starter, Starter waived any rights that it might have had to pursue a claim against Hidary.  As an assignee of Starter, Beckerman has no greater rights than Starter would have had if there had been no assignment.

Plaintiff makes the absurd claim that Starter's filing for bankruptcy and rejection of the license agreements was not a material breach of those agreements and argues that despite knowing in August 1999 that Hidary was paying royalties to Official Starter, Starter's failure to take any steps to collect any royalties for <u>more</u> than two years was not a waiver because "the Plan Administrator had more pressing issues."

3

## ARGUMENT

### Point I

### All Rights To The Royalties Were Assigned To Official Starter Pursuant To The Asset Purchase Agreement Years Prior To Beckerman's Assignment

In our moving brief, Hidary and Official Starter demonstrated that pursuant to the clear and unambiguous terms of the Asset Purchase Agreement and Trademark Assignment which was a part thereof, Starter assigned to Official Starter all of its trademarks (including the Marks licensed to Hidary). That assignment specifically granted Official Starter the right to all income and royalties with respect to said trademarks due on and after July 29, 1999. (See, Weintraub Decl.[1], Ex. F, Kraner Aff.[2], Ex.'s A, B and C). As a result, Starter no longer had the right to any royalties with respect to the trademarks. Accordingly, Beckerman, as an assignee of Starter, cannot recover any royalties from Hidary.

In response, Beckerman argues that because the Asset Purchase Agreement between Starter and Official Starter (see, Weintraub Decl., Ex. F) excluded the License Agreements and royalties receivable thereunder, Starter retained the rights to those royalties and, pursuant to a Non-Exclusive License Agreement (see, Letendre Supp. Aff.[3], Ex. A), was able to assign those receivables to Beckerman more than two years later.

---

[1] References to the "Weintraub Decl." are to the Declaration of Evan Weintraub, Esq. dated November 20, 2003 and submitted along with the Motion for Summary Judgment on behalf of Hidary and Official Starter.
[2] References to the "Kraner Aff." are to the Affidavit of Benton E. Kraner, sworn to on March 26, 2004 in Support of the Motion for Summary Judgment on behalf of Hidary and Official Starter.
[3] References to the "Letendre Supp. Aff." are to the Affidavit of Gary Letendre, sworn to on March 5, 2004 in opposition to the Motion for Summary Judgment on behalf of Hidary and Official Starter.

To begin with, Beckerman's argument ignores the plain meaning of the Trademark Assignment and misinterprets the Non-Exclusive License Agreement beyond comprehension.  Here, the Trademark Assignment delivered pursuant to the Asset Purchase Agreement transferred to Official Starter, on July 29, 1999, all of Starter's "right, title and interest in and to the [Trademarks] . . . together with income, royalties, damages or payments due on the date hereof or thereafter."  (Weintraub Decl., Ex. F, Kraner Aff., Ex.'s A, B and C).  Thus, pursuant to the plain meaning of that agreement, Starter relinquished <u>all</u> of its rights to royalties associated with the marks, be it past, present or future.  "If the language of a contract is clear and unambiguous, the contract is to be given effect in accordance with its terms."  <u>RLI Insurance Co. v. Hartford Accident and Indemnity Co.</u>, 980 F.2d 120, 122 (2d Cir. 1992).  Not surprisingly, plaintiff ignores any mention of the Trademark Assignment in its opposing papers.

Despite the plain meaning of the Trademark Assignment, plaintiff contends that the Non-Exclusive License Agreement, which merely gave the bankrupt estate the right to use the licenses for the sell-off of inventory, also *sub silentio* gave it the right to collect royalties and other payments due on the Starter licenses - - the very rights explicitly granted to Official Starter by the Trademark Assignment.  (See, Plaintiff's Brief, p. 9).  This interpretation is a figment of plaintiff's imagination having no relationship to the clear language of that agreement.  See, <u>Metropolitan Life Insurance Co. v. RJR Nabisco, Inc.</u>, 906 F.2d 884, 889 (2d Cir. 1990) ("language whose meaning is otherwise plain is not rendered ambiguous simply because the parties urge different interpretations in litigation.")

5

The Non-Exclusive License Agreement merely provided Starter and its affiliates (collectively, defined therein as the "Licensees") with a 2 year license in connection with (i) "the operation of certain discount outlet stores" and (ii) "the sale of certain goods currently in Licensees' inventory, goods which the Licensees are contractually obligated to purchase, work in process, goods which are validly returned to Licensees and other assets of Licensees which are not included in the Purchased Assets (as defined in the Purchase Agreement) . . .."  (See, Letendre Supp. Aff., Ex. A).

The Non-Exclusive License Agreement is devoid of any mention of Starter's use of the license to collect royalties receivables from the Starter license agreements.

Both the Trademark Assignment and the Non-License Agreement were Exhibits to the Asset Purchase Agreement.  It was clearly contemplated that both Exhibits would be executed simultaneously at the closing.  One document (the Trademark Assignment) explicitly provided that Official Starter was to be assigned the Trademarks together with all income, royalties or other payments due thereon.  The other document was a limited license to sell off inventory.  Plaintiff claims that this limited right implicitly negated the explicit rights simultaneously granted to Official Starter.  Plaintiff engages in this legerdemain by reading non-existent words into the Non-Exclusive License.

If the intention was that Starter retain the right to collect royalties, the Limited License Agreement would have so stated.  See, <u>Components Direct, Inc. v. European American Bank and Trust Co.</u>, 175 A.D.2d 227, 230, 572 N.Y.S.2d 359, 361 (2d Dep't 1991).  The reason it did not is clear – no such right could be granted to Starter because those rights were assigned to Official Starter on the same day pursuant to the Trademark Assignment.  "A court cannot import into an agreement a different provision nor can the

6

construction of the agreement be changed to vary the express limitations of its terms." Bank of Boston v. Scott Real Estate, Inc., (40 Conn.App. 616, 621, 673 A.2d 558, 561 (Conn. App. 1996).

Moreover, Beckerman's argument that he was assigned the rights under the Non-Exclusive License Agreement in October 2001 also flies in the face of the plain language of that agreement. Indeed, Paragraph 11 of the Non-Exclusive License Agreement specifically provides that "neither this agreement nor any of the rights granted to Licensees hereunder may be assigned, sublicensed or otherwise transferred by any of them". (Letendre Supp. Aff., Ex. A) (emphasis added). Thus, assuming arguendo that Starter was granted the right to collect royalties pursuant to the Non-Exclusive License Agreement -- and it was not -- Starter could not assign that right to Beckerman or anyone else. Plaintiff also glosses over the fact that the purported assignment by Starter to Beckerman occurred on October 10, 2001 (see, Weintraub Decl., Ex. K), more than 2 months after the 2 year term of the non-exclusive license agreement had expired on July 29, 2001.

The fact that Official Starter decided in the course of negotiations not to purchase or assume the license agreements from Starter, does not detract from the rights transferred by Starter to Official Starter pursuant to the Trademark Assignment. Once it was decided that the various Trademark Licenses (including the Hidary License) would be rejected, no such purchase or assumption was necessary. That rejection was confirmed by Order of the Bankruptcy Court (see, Weintraub Decl., Ex. G, pp. 16-17), thereby terminating the license agreements and obviating any need to assign them.

**Point II**

**Starter's Rejection Of The Licensing Agreement
Relieved Hidary Of Its Obligations Thereunder**

In our moving papers, Hidary and Official Starter demonstrated that Starter's rejection of the License Agreement constitutes a material breach that relieved Hidary of its obligations thereunder. As a result, Hidary, as a matter of law, is not responsible for the payment of royalties to Starter. In response, plaintiff argues that (i) Starter's rejection of the License Agreement was not a breach of that agreement; (ii) if there was a breach by Starter, it was not material; and (iii) the License Agreement provides for a specific remedy in the event of bankruptcy. Here, plaintiff has entirely misconstrued the law concerning the effect of a debtor's rejection of a contract under the Bankruptcy Law and has once again ignored the plain meaning of the terms of the license agreement between Hidary and Starter.

It is undisputed that pursuant to Bankruptcy Code section 365(g), if a contract is not previously assumed, rejection of the debtor's contract constitutes a breach, which is deemed to occur on the day immediately prior to the debtor's bankruptcy filing. See 11 U.S.C. § 365(g); Bridgeport Jai Alai, Inc. v. Autotote Sys., Inc., 215 B.R. 651, 657 (Bankr. D.Conn. 1997). Furthermore, Connecticut law provides that a party is relieved of continued performance under the contract when the other party's breach is material. See A. Prete & Son Const. v. Town of Madison, No. CV 91-03103073-S, 1994 WL 570243 at *14, (Conn. Super. Ct. 1994). According to the standards promulgated by the Restatement (Second) of Contracts § 241 (1981), Starter's breach of the license agreement with Hidary was material. (See, Memorandum of Law in Support of Motion, p. 10).

8

While conceding that rejection of the debtors' executory contract constitutes a breach (see, Pl. Brief, p. 11), plaintiff baldly argues that the breach was not material because Hidary continued to sell merchandise and thus, was not deprived of the benefit of its bargain. (See, Pl. brief, p. 13). Plaintiff's argument is nonsensical and is nothing short of revisionist history. What plaintiff fails to understand is that Hidary was able to sell Starter branded merchandise after July 29, 1999 only because Official Starter, the then owner of all of Starter's trademarks pursuant to the Asset Purchase Agreement, permitted Hidary to do so.[4]

Upon the rejection of the Licensing Agreement, Starter was no longer the owner of the Trademarks it had licensed to Hidary. Pursuant to the July 14, 1999 Asset Purchase Agreement (including the Trademark Assignment), Official Starter acquired all of the Trademarks from Starter effective July 29, 1999. (Weintraub Decl., Ex. F). Thus, after July 28, 1999, Hidary could no longer legally use the Trademarks as Starter's licensee. Moreover, any use of the Trademarks by Hidary after July 28, 1999 in the absence of consent by Official Starter, would constitute an infringement of the Trademarks. Thus, the very right that constituted the basis of the Licensing Agreement, i.e., use of the Starter Trademarks, was no longer available to Hidary. Accordingly, Starter's rejection of the license agreement satisfies the Restatement's criteria to

---

[4] Plaintiff's claim that Hidary enjoyed a windfall as a result of its sale of Starter branded apparel after July 29, 1999 also makes no sense. On July 30, 1999, Official Starter notified Hidary that the Licensing Agreement had been rejected by Starter in the bankruptcy proceedings, and that royalties for any Starter products sold by Hidary on or after July 29, 1999, should be remitted to Official Starter. (Weintraub Decl., Ex. H). Thus, Hidary paid royalties after that date to Official Starter.

determine the materiality of a breach[5], relieving Hidary of any obligation under the Licensing Agreement.  See Bernstein v. Nemeyer, 570 A.2d 164 (Conn. 1990).

## Point III

### Starter Waived Its Right To Collect Under The Licensing Agreement

In responding to our waiver argument, Beckerman claims that because Hidary was a bidder on Starter assets before July 14, 1999, it was aware of the Court's order of that date.

Prior to July 14, 1999, Hidary knew that it was not the successful bidder and therefore had no reason to follow the Bankruptcy Court proceeding.  Shortly after July 29, 1999, it received two notices; one from Official Starter's representative (Weintraub Decl., Ex. H) and one from Starter's designated agent, Don Stapleton (Weintraub Decl., Ex. I).  Both notices informed Hidary all that it had to know; that from and after July 29, 1999, all royalties would be payable to Official Starter.  It was not until after the receipt of both notices that the Bankruptcy Court terminated Stapleton's agency.  (Letendre Aff., Ex. G).

There is nothing in the record to suggest that Hidary was, or should have been, aware of the termination of Stapleton's agency.  On the other hand, Starter was not only aware that the agency was terminated, it also knew:

---

[5]  First, without a valid and enforceable agreement, Hidary could no longer use Starter's Trademark, vitiating the very purpose of the contract.  Second, no compensation is adequate to remedy Hidary's injury.  Without the Licensing Agreement, Hidary was unable to use Starter's Trademarks, resulting in the loss of its entire business operation that utilized the Trademarks.  Third, Starter could not cure its breach.  The very intellectual property rights that are the subject matter of the Licensing Agreement, including the royalties thereunder, were sold to Official Starter. (See, Weintraub Decl., Ex. F).  Moreover, simultaneously with that sale, Starter expressly rejected the Licensing Agreement as part of its bankruptcy liquidation and sale of its assets to Official Starter.  Thus, Starter utterly deprived Hidary of the very basis of its bargain – the right to exploit the trademarks and accordingly, Starter's rejection and resulting breach was material.

10

      (a)    That Stapleton had instructed all licensees to pay royalties to Official Starter on shipments on or after July 29, 1999;

      (b)    That the statement by Hidary to Starter for July covered only the period from July 1 – 29 (see, Weintraub Decl., Ex. J) rather than the entire month; and

      (c)    That no other statements or payments to Starter were made by Hidary.

Beckerman's assertions in this context that somehow Hidary is at fault is simply inane.

By failing to take any steps to recover the royalties allegedly due from Hidary until November 15, 2001[6], Starter waived any right that it may have had -- and it had none -- to claim any entitlement to the royalties it now seeks. See Statewide Grievance Comm. v. Brown, 786 A.2d 1140 (Conn. App. Ct. 2001).

Simultaneously with the July 14, 1999 rejection and termination of the Licensing Agreement, Starter sold all of its interests in the Trademarks to Official Starter. During the pendency of the bankruptcy and for sales made through July 28, 1999, Hidary made royalty payments to Starter pursuant to the Licensing Agreement. Starter readily accepted these payments, but never made any attempt to collect any amount allegedly owed for sales following the rejection of the Licensing Agreement.

In fact, even when, in August 1999, Starter learned that Stapleton had directed that royalty payments for the period after July 29, 1999 be made to Official Starter, Starter, by its total silence over a two year period, consented to such payments. If Starter had any claim to royalties after July 28, 1999 --and it does not – it was required to inform Hidary of such a claim.

---

[6] Beckerman filed his Complaint on November 15, 2001.

11

Beckerman's opposition, that he did not waive his right to collect royalties under the License Agreement because he was not even assigned the rights until October 10, 2001, falls wide of the mark. (See, Pl. Brief, p. 14). Beckerman's actions during November 2001 are not the issue. Once again, plaintiff fails to understand that Beckerman, as assignee of Starter's claims, stands in the shoes of Starter, but "has no greater rights or immunities than the assignor would have had if there had been no assignment." Shoreline Communications, Inc. v. Norwich Taxi, LLC, 70 Conn.App. 60, 72, 797 A.2d 1165, 1172 (Conn. App. Ct. 2002) citing Fairchild Credit Corp. v. Donnelly, 158 Conn. 543, 552, 264 A.2d 547 (1969). Having waived its claim to any royalties, Beckerman, as assignee of Starter's claims, cannot recover the royalties from Hidary.

Furthermore, plaintiff's explanation[7] for Starter's failure to pursue any moneys during the two years after July 29, 1999 (i.e., that the Plan Administrator decided to pursue other claims because he "had more pressing issues than chasing Hidary for overdue royalty payments") confirms that Starter waived any rights that it might have had. Indeed, Starter's Plan Administrator, with the full knowledge that Hidary was paying royalties to Official Starter, and whose principal objective was to marshal Starter's assets, affirmatively chose not to pursue those claims.

By virtue of Starter's conduct, Starter waived its claim to any royalties or other payments and/or is estopped from seeking any such relief. (See Answer to Second Amended Complaint, 3rd defense).

---

[7] Plaintiff's fall back position based on the Non-Exclusive License Agreement also must fail. As set forth more fully in Point I above, the term of that agreement expired months prior to the alleged assignment to Beckerman, and, moreover, the express terms of that agreement prohibit any such assignment.

12

**Point IV**

**The Claim for Advertising Allowance**

In his answering brief Beckerman states that: "The fundamental flaw in Hidary's argument is that the [advertising promotion] payments were due <u>before</u> the rejection of the License Agreement and the sale of the trademarks." (Pl.'s Brief, P. 16) (emphasis in original). The fundamental flaw in this argument is that it is flat wrong. No payments were due to Licensor until "a request" therefor was made. And no request was made by Starter prior to the rejection of the License Agreement.

The precise words of the License Agreement which Beckerman conveniently ignores are: "Any deficiency in the amount expended by Licensee as a Minimum Promotional Investment with respect to any Contract Year, <u>upon the request of Licensor</u>, shall be remitted immediately to Licensee to advertise, or otherwise promote the sales or image of Authorized Products bearing Marks ..." (Weintraub Decl., Ex. A, ¶ 10.6) (emphasis added).

Beckerman also conveniently overlooks another requirement of ¶ 10.6 of the License Agreement: that the licensor would use any payments required there under to "advertise or otherwise promote [the Trademarks]." (Weintraub Decl., Ex. A, ¶ 10.6). As shown in our initial brief (P. 14), even if there was a shortfall[8], Starter could not fulfill its obligation to advertise or promote the Trademarks as required by ¶ 10.6 of the License Agreement.

---

[8] As shown in our moving brief, there was no shortfall.

13

Finally, Beckerman also conveniently makes no reference to the Trademark Assignment which expressly grants to Official Starter not only royalties, but all other "payments due" on or after July 29, 1999.

Since most of the alleged "shortfall" occurred in the calendar year 1999, nothing would have been due to Starter until the end of that Contract Year. By December 31, 1999, the contract had been rejected and, therefore, breached by the Licensor.

**Conclusion**

For the foregoing reasons, and the reasons set forth in their moving papers, it is respectfully submitted that the motion for summary judgment on behalf of Hidary and Official Starter be granted, along with such other and further relief as this Court may deem just and proper, and plaintiff's motion for summary judgment be denied.

Dated: New York, New York
March 31, 2003

                                WACHTEL & MASYR, LLP

                                By: _____
                                    Evan S. Weintraub
                                Admitted Pro-Hac Vice
                                Attorneys for Third-party defendant
                                Official Starter, LLC
                                110 East 59th Street
                                New York, New York 10022
                                Tel. (212) 909-9500
                                CT 23444

                                GOODKIND LABATON RUDOFF
                                 & SUCHAROW LLP

                                By:_____
                                   Edward Labaton
                                Admitted Pro Hac Vice
                                Attorneys for Defendant
                                M. Hidary & Co., Inc.
                                100 Park Avenue
                                New York, New York  10017
                                Tel. (212) 907 - 0700
                                CT 23784