UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

```
-----------------------------------X
DAVID A. BECKERMAN,                 :

     Plaintiff,                     :

          vs.                       : No. 3:01CV2143(SRU)(WIG)

M. HIDARY & CO., INC.,              :

     Defendant.                     :
-----------------------------------X
M. HIDARY & CO., INC.,              :

     Third-Party Plaintiff,         :

          vs.                       :

OFFICIAL STARTER, LLC,              :

     Third-Party Defendant.         :
-----------------------------------X
```

## RULING ON MOTIONS FOR SUMMARY JUDGMENT

David Beckerman, as assignee of certain rights and claims from the debtor, Starter Corporation ("Starter"), has brought this action for breach of contract, unjust enrichment, and an accounting against M. Hidary & Co., Inc. ("Hidary"), a trademark licensee of Starter, attempting to collect royalties and other fees allegedly due under a trademark licensing agreement between Starter and Hidary. Hidary has asserted a third-party claim for indemnification against Official Starter, LLC, ("Official Starter"), claiming that to the extent that any royalties are due to Beckerman, these were paid to Official Starter and should be remitted to Hidary.

1

Now pending before the Court are the motion for summary judgment of Hidary and Official Starter **[Doc. # 44]** and the cross-motion for summary judgment of Beckerman **[Doc. # 48]**.  For the reasons set forth below, the motion for summary judgment of Hidary and Official Starter will granted, and the cross-motion for summary judgment of Beckerman will be denied.

## Summary Judgment Standard

The standard for granting a motion for summary judgment is well-established.  A moving party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The burden of establishing that there is no genuine factual dispute rests with the moving party. See Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1223 (2d Cir. 1994).  In ruling on a summary judgment motion, the Court cannot resolve issues of fact.  Rather, it is empowered to determine only whether there are material issues in dispute to be decided by the trier of fact.  Id. at 1224.  The substantive law governing the case identifies those facts that are material.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  In assessing the record to determine whether a genuine dispute as to a material fact exists, the Court is required to

resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party.  Id. at 255; Matsushita Electric Ind. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

**Background**

The following facts are taken from the parties' Local Rule 56(a) Statements, accompanying affidavits, and exhibits, and are undisputed except as otherwise noted.

Plaintiff David Beckerman was the founder, principal shareholder, and president of Starter Corporation, a company engaged in the design and marketing of apparel bearing the logos and insignia of sports teams, colleges, and universities. (Bankruptcy Pet'n Ex. A.)  Starter owned in excess of thirty (30) registered trademarks, many of which were licensed to various apparel manufacturers, distributors, and accessory companies. (Letendre Aff. ¶ 15; Kraner Aff. Ex. A.)  Starter also owned and operated a number of discount outlet stores. (Letendre Supp. Aff. Ex. A.)

On May 2, 1997, Starter Corporation entered into a Licensing Agreement with Hidary, which granted Hidary an exclusive license to use certain trademarks owned by Starter, namely "STARTER," "S and STAR," and "STARTER in conjunction with S and STAR," in connection with the sale and distribution of certain authorized products.  Initially, the "authorized products" were boys' and men's swim wear, and the term of the License Agreement was until

December 31, 2000.  The agreement was signed by Starter, Hidary, and SoundView Licensing, a company retained by Starter as its agent to monitor sales and royalty payments by its licensees.  By a June 1998 Addendum, the list of "authorized products" was expanded to include activewear and school uniforms.  (Addendum 1.)[1]

In exchange for the right to use the Starter trademarks, Hidary agreed to pay Starter a royalty of eight percent (8%) on all net sales of authorized products bearing a Starter trademark. (License Agreement ¶ 5.1.)  In order to determine the amount of the royalty payment, Hidary was required to provide a monthly accounting to Starter, showing gross sales and deductions for each product covered by the License Agreement.  (License Agreement ¶ 5.4.)  In addition, the Agreement required Hidary to make a "Minimum Guarantee" payment against royalties of $280,000, with an advance payment of $70,000, and the balance to be paid in ten (10) equal quarterly installments of $21,000.  (License Agreement ¶ 5.2.)  This amount was later increased to $750,000 by the June 1998 Addendum.  See Note 1, supra.  The License Agreement also required Hidary to expend each year a Minimum

---

[1]  The Addendum also extended the term of the License Agreement as it pertained to activewear products (Addendum 1 ¶ 2(a)), and imposed a Minimum Guarantee on activewear products only of $750,000, of which $400,000 was payable no later than June 26, 1998.  The remainder was payable in quarterly installments of $67,000, the first of which was payable on 7/99. (Addendum 1 ¶ 4.)

Promotional Investment for advertising and promotions equal to at least two percent (2%) of actual sales of authorized products bearing a Starter trademark.  In the event the promotional fees spent by Hidary did not equal two percent (2%), upon request of Starter, Hidary was required to remit the difference to Starter to advertise or otherwise promote to advertise or promote the authorized products.  (License Agreement ¶ 10.6.)  If the deficiency occurred in the final year of the Agreement or after termination of the Agreement, then the funds could be used by Starter to advertise or promote products associated with the trademarks.  (Id.)

The License Agreement provided for its automatic termination

> without any notice or action being required of Licensor or Licensee, if Licensor or Licensee files a petition in bankruptcy or is adjudicated a bankrupt or insolvent, makes any assignment for the benefit of creditors or any arrangement pursuant to any bankruptcy law, or discontinues its business, or if a receiver is appointed for Licensee/Licensor or for Licensee's/Licensor's business.

(License Agreement ¶ 18.1.)  In the event of a termination of the License Agreement, Hidary was allowed a 120-day sell-off period, during which it could dispose of products, which were in inventory or in process, provided its payments were up-to-date and that it paid Starter royalties for products sold during the sell-off period.  (License Agreement ¶ 20.)  At the end of the 120-day period, all authorized products, at Starter's election,

were to be sold to Starter at cost or destroyed.  (Id.)  Upon the expiration or termination of the license, all rights granted to Hidary, except as specifically otherwise provided, reverted to Starter, who was free to enter into licenses with others. (License Agreement ¶ 21.)  The Agreement provided that it was to be governed by, and construed in accordance with the laws of Connecticut.  (License Agreement ¶ 26.)

On April 19, 1999, Starter and several affiliated corporations filed a voluntary petition for protection under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware.  (Weintraub Aff. Ex. C.) Shortly after the bankruptcy filing, it became apparent that Starter was not going to attempt to reorganize but was going to sell the majority of its assets.  Under procedures approved by the Bankruptcy Court, Starter sought bids for the assets it wished to sell and conducted an auction.  (Wyron Aff. ¶ 6.) Official Starter, LLC, formed by a number of investors, was the successful bidder at the auction and purchased substantially all of Starter's assets, including all of Starter's Trademarks,[2]

---

[2]  "Trademarks" was defined by the Asset Purchase Agreement as "the domestic and international trademarks and service marks (registered and unregistered) and trade names, and all goodwill of the business associated therewith and licenses and registrations relating thereto, listed on **Schedule D** attached hereto."  (Original emphasis).

pursuant to an Asset Purchase Agreement dated July 14, 1999.[3]

Section 2.2 of the Asset Purchase Agreement provided in relevant part:

> All of Sellers' licenses of the Trademarks and other agreements permitting third parties the right to use the Trademarks not included in the Assigned Contracts will be rejected by Sellers in the Order or immediately after Closing (all in accordance with Section 365 of the Bankruptcy Code).[4]

The Asset Purchase Agreement was initially drafted so that Official Starter would take over all of the Starter licensing agreements, including the Hidary License Agreement. However, during the course of the negotiations, Official Starter decided not to purchase the licenses and, thus, these were not included in the assets sold under the agreement. (Letendre Aff. ¶ 7.)[5]

---

[3] The purchasers under the Asset Purchase Agreement were Schottenstein/SC Acquisition LLC, Value City Department Stores, Inc., and Schottenstein Stores Corporation, which then formed New Starter Corporation, which then became Official Starter LLC. For ease of reference, the Court has referred to the purchaser as "Official Starter" throughout this opinion (as have the parties throughout their summary judgment papers).

[4] Section 365 provides in relevant part:

> (a) Except as provided in section 765 and 766 of this title and in subsections (b), (c), and (d) of this section, the trustee, subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor.

11 U.S.C. § 365(a).

[5] The Asset Purchase Agreement defined "Assigned Contracts" as those listed in Schedule B. However, the Agreement does not

The Bankruptcy Court then entered an Order, dated July 14, 1999, authorizing and approving the Asset Purchase Agreement, authorizing the sale of the debtor's assets subject to the terms of the Agreement, and authorizing the debtor to consummate all related transactions.  The Order specifically provided:

> Pursuant to Section 2.2 of the Asset Purchase Agreement, <u>all of the Debtors' licenses of the Trademarks</u> and other agreements permitting third parties the right to use the Trademarks being transferred to [Official Starter] <u>are rejected pursuant to Section 365 of the Bankruptcy Code as of the Closing</u> (the "Subject Licenses").

(Order at (y))(emphasis added).  The Order reiterated that the licensing agreements were not part of the "Purchased Assets."  It stated in a footnote  "[f]or purposes of this Order,'Purchased

---

contain a Schedule B, and the Table of Contents, listing the sections of the Asset Purchase Agreement, the Schedules and Exhibits, indicates "Schedule B – Assigned Contracts (None)."

Additionally, an "Assignment and Assumption Agreement," which was part of the original Asset Purchase Agreement, was crossed out and never signed by the parties.  This Assignment and Assumption Agreement would have assigned to Official Starter of "all of [Starter's] right, title and interest in and to certain license agreements (the 'Assigned Contracts') as listed on Schedule B of the Asset Purchase Agreement."

Mr. Letendre, who was involved in the negotiation of the Asset Purchase Agreement, states in his affidavit in support of Beckerman's motion for summary judgment that the term "Assigned Contracts" included the Hidary Licensing Agreement. (Letendre Aff. ¶ 7.)  The Court, however, finds no support for that statement in the documents attached to his affidavit. Additionally, Plaintiff confirms in his Local Rule 56(a)1 Statement that "[t]he license agreements were <u>not</u> included in the Asset Purchase Agreement, nor were the rights to collect royalties thereon."  (Pl.'s St. ¶ 10)(emphasis added).

Assets' shall not include the items listed in clauses (a), (b) and (f) of the definition of 'Purchased Assets' in the Asset Purchase Agreement." (Order at n. 1.) Clauses (a), (b), and (f), respectively, listed the Assigned Contracts, all claims or causes of action of the estates of Sellers related to the licenses, and the Royalties Receivable.[6] (Asset Purchase Agreement § 1.1.)

Pursuant to section 9.1 of the Asset Purchase Agreement, the closing was held fifteen (15) days thereafter, on July 29, 1999. At the closing, the Trademark Assignment Agreement, annexed to the Asset Purchase Agreement (Exhibit E), was delivered to Official Starter,[7] selling, assigning, and transferring to Official Starter all of Starter's

> entire right, title, and interest in and to the Marks, along with the goodwill of [Starter's] business in connection with which the Marks are used, free and clear of any Encumbrance, . . . together with income, royalties, damages or payments due on the date hereof or thereafter, including, without limitation, all claims for damages or

---

[6] "Royalties Receivable" was defined by the Asset Purchase Agreement as "the royalties receivable as of the date of [sic] hereof which are directly related to the licenses of Trademarks included in the Assigned Contracts."

[7] Although a question was raised by Beckerman as to whether the Trademark Assignment Agreement was ever signed by the parties, Official Starter subsequently provided the Affidavit of its director Benton Kraner, who produced a signed copy of the U.S. Trademark Assignment Agreement dated July 29, 1999, between Starter and Official Starter, as well as two other trademark assignment agreements with two related Starter companies.

> payments by reason or [sic] infringement or
> unauthorized use of the Marks, with the right
> to sue and collect same for [Official
> Starter's] own use and enjoyment and for the
> use and enjoyment of its successors, assigns,
> or other legal representatives.

(Assignment Agreement at 1)(emphasis added).[8]

In order to allow Starter to use the trademarks for certain
limited purposes for a two-year period following the
closing, Starter and Official Starter entered into a Non-
Exclusive License Agreement, in which Official Starter granted to
Starter the right to use Starter's former trademarks for

> the operation of certain discount outlet
> stores . . . the sale of certain goods
> currently in [Starter's] inventory, goods
> which [Starter is] contractually obligated to
> purchase, work in process, goods which are
> validly returned to [Starter] and other
> assets of [Starter's] which are not included
> in the Purchased Assets (as defined in the
> [Asset] Purchase Agreement]).

The Non-Exclusive License Agreement allowed Starter to use the
trademarks solely in connection with these limited, permitted
uses.  (Non-Excl. License ¶ 1.)  As part of this Agreement,
Starter expressly acknowledged that the trademarks were owned by
Official Starter and that nothing in this Agreement would give
Starter "any right, title or interest in the Marks other than the
right to use the Marks in accordance with this License."  (Non-
Excl. License ¶ 2.)  This Agreement was also approved by the

---

[8] See also U.S. Trademark Assignment Agreement dated July
29, 1999, attached to Kraner Affidavit as Exhibit A.

10

Bankruptcy Court.

The day after the closing, July 30, 1999, Parthenon Capital, which had been part of the Official Starter consortium, notified "Starter Licensees," including Hidary, that a new company known as Official Starter had acquired the name and all of the trademarks of Starter.  (Weintraub Aff. Ex. H.)  Parthenon advised the licensees that their licensing agreements had been rejected by Starter as part of the bankruptcy proceedings and that they should remit to Official Starter all royalty payments for products sold on or after July 29, 1999.  (<u>Id.</u>)  Additionally, the letter stated that Official Starter hoped to enter into replacement licenses with the Starter licensees.  (<u>Id.</u>)

Approximately one week later, on August 8, 1999, SoundView Licensing,[9] which had acted as Starter's licensing agent in connection with the Hidary Licensing Agreement, sent Hidary a memo addressed to "All Starter U.S. Licensees," stating that it had been engaged by Official Starter "to provide assistance and counsel to help assure a seamless transition from 'old' Starter to Official Starter with respect to Starter brand licensing." (Weintraub Aff. Ex. I.)  The memo indicated that the "first order of business" would be to issue replacement licenses for those that were rejected as part of Starter's bankruptcy.  SoundView

---

[9]  By Order of the Bankruptcy Court dated August 16, 1999, SoundView was discharged as Starter's agent effective as of July 29, 1999.

advised the licensees that all royalty payments for shipments made after July 29, 1999, along with royalty reports, should be sent to Official Starter.  (Id.)

Based upon these instructions from Parthenon and SoundView, Hidary paid to Official Starter royalties on all licensed products shipped after July 29, 1999.  As to all products covered by the Licensing Agreement that were sold prior to July 29, 1999, Hidary provided Starter with an accounting for the period July 1 to July 28, 1999, and paid to Starter royalties of eight percent (8%) on all sales during this period.  (Weintraub Aff. Ex. J.)[10] What was not covered by this report and what was not paid to Starter were royalties for any sales of inventory on hand or in process as of July 29, 1999.  (Letendre Aff. ¶ 23.)  To the extent that these products were sold by Hidary after July 28, 1999, the royalties were paid to Official Starter.  Neither Starter nor anyone on Starter's behalf ever made a demand for the payment of any additional royalties by Hidary until some thirty (30) months later.

On January 1, 2000, Official Starter and Hidary entered into a formal licensing agreement for Starter goods.

On October 10, 2001, the Bankruptcy Court issued an Order

---

[10]   Exhibit J is the "Monthly Royalty Report" from Hidary to Starter for the period "July 1 - 28, 1999."  It shows total sales of swim wear and active wear in the amount of $1,190,870.40, on which the royalty amount was $95,269.63, less an advance of $89,336.06, for a balance due of $5,933.57.

approving final distribution, terminating the plan administrator's duties and responsibilities, and closing his portion of the estate.  In that Order, the Court approved a quitclaim assignment to Beckerman of accounts receivable, tax refunds, and miscellaneous assets in settlement of Beckerman's $22,000,000 claim against the bankruptcy estate based upon a personal guarantee.  (Letendre Aff. ¶ 21.)  An Assignment Agreement between Beckerman and the Plan Administrator, Gary Letendre, assigned to Beckerman the right to take any and all actions as appropriate or necessary to enforce the rights, interests, and claims assigned to him.  (Assignment Agreement ¶ 2.)  The Plan Administrator expressly disclaimed any representation as to the existence, character, value, or any other attribute of any of the assets being assigned.  (Assignment Agreement ¶ 4.)  Attached to the Agreement were a number of schedules, including Schedule C, "Miscellaneous Assets," which included, inter alia, "[a]ll rights, claims and causes of action against each of the entities listed in Schedule C-1 . . . held by one or more of the Debtors or their Estates, including all rights to royalty payments due from the Licensees to one or more of the Debtors or their Estates."  Schedule C-1 listed eleven (11) licensees, including Hidary.

    On November 15, 2001, Beckerman commenced this action against Hidary and, as noted above, Hidary then filed a third-

party complaint against Official Starter, seeking indemnification
for any sums that it might owe Beckerman.

## Discussion

"It is hornbook law . . . that an assignee 'stands in the
shoes of the assignor.'" Shoreline Communications, Inc. v.
Norwich Taxi, LLC, 70 Conn. App. 60, 72 (2002) (quoting Rumbin v.
Utica Mutual Ins. Co., 254 Conn. 259, 277 (2000)); see also
National Loan Investors Ltd. P'ship v. Heritage Square Assocs.,
54 Conn. App. 67, 73 (1999); 3 E. Farnsworth, Contracts § 11.8
at 105-07 (1998); 3 S. Williston, Contracts § 404 at 5, § 432 at
181-83 (3d ed. 1960). "An assignee has no greater rights or
immunities than the assignor would have had if there had been no
assignment." Shoreline Communications, 70 Conn. App. at 72
(citing Fairfield Credit Corp. v. Donnelly, 158 Conn. 543, 552
(1969)). Thus, in evaluating Beckerman's rights to royalties and
other payments from Hidary, the Court must look to the rights
that Starter possessed at the time of the assignment to
Beckerman.

In the instant case, Beckerman, as the assignee of Starter's
rights, claims and causes of action against Hidary, seeks to hold
Hidary liable for percentage royalties, minimum guarantees, and
promotional fees allegedly due to Starter under the Hidary
License Agreement. His percentage royalty claim relates to
inventory on hand and in process as of April 19, 1999, the day

14

Starter filed for bankruptcy protection.  Citing ¶ 18.1 of the
License Agreement, Beckerman asserts that Starter's filing of a
petition in bankruptcy constituted an automatic termination of
the License, following which the Agreement provided for a 120-day
sell-off period.  During this sell-off period, Hidary had the
right to sell products bearing the Starter trademarks, which were
in inventory or in process, but was required to remit to Starter
royalty payments on these sales.  Beckerman states that Hidary
never made any payments to Starter for the inventory or work in
process as required.  He argues that the Asset Purchase Agreement
and Bankruptcy Order expressly excluded the trademark license
agreements and royalty receivables from the assets sold to
Official Starter.  Thus, these remained assets of the bankruptcy
estate.  Beckerman also points to the Non-Exclusive License
Agreement between Official Starter and Starter, in which Starter
was given the right to sell goods bearing a trademark to the
extent such products were received as inventory or work in
process.

     In response, Hidary and Official Starter rely principally on
the Trademark Assignment Agreement, which, they assert, expressly
and unequivocally transferred to Official Starter all of
Starter's "right, title, and interest" in the trademarks,
"together with income, royalties, damages or payments due" as of
July 29, 1999, or thereafter.  Additionally, they assert that

Starter rejected the Hidary License Agreement, which rejection, under section 365 of the Bankruptcy Code, was effective as of April 18, 1999, the day prior to Starter's filing for bankruptcy protection.  This rejection constituted a major default under the License Agreement such that any obligation of Hidary thereunder ceased to exist.  That breach, coupled with the sale to Official Starter of the trademarks and the right to collect all royalties due as of July 29, 1999, left Starter without any rights whatsoever to unpaid royalties on sales of products made on or after July 29, 1999.  It also left Hidary with no option for disposing of its inventory and goods in process other than to enter into an agreement with the new owner of the trademarks.

Hidary and Official Starter do not disagree that under the Licensing Agreement the filing of a petition in bankruptcy constituted an event of default, but argue that in light of this default, Hidary was relieved of all further obligations thereunder.[11]

Lastly, Hidary asserts that it acted in good faith in relying on the instructions from SoundView, the apparent agent of Starter, in making payments to Official Starter.  It was never

---

[11]  As a fall-back argument, they argue that, if the Court finds that any royalties are due under the 120-day sell-off provision, the 120-day period commenced on April 18th and ended on August 16, 1999.  Since royalty payments were made to Starter on all sales through July 28, 1999, Beckerman's claim would only encompass sales during a three-week period, from June 29 to August 16, 1999.

advised that SoundView was no longer acting as Starter's agent.
Moreover, Starter waived any right to these royalty payments by
waiting thirty (30) months before attempting to collect these
payments.  No later than August of 1999,[12] Starter was aware that
SoundView had instructed Hidary to make these payments to
Official Starter,[13] yet no demand was made on Hidary for royalty
payments for thirty (30) months, when Beckerman received an
assignment of all claims and causes of action of Starter.  Hidary
and Official Starter further emphasize that, in making the
assignment, the Plan Administrator expressly disclaimed any
representation as to the value or existence of the assets being
assigned.

        Regardless of which theory the Court should adopt, Hidary
and Official Starter assert that Starter had no right to royalty
payments from Hidary at the time of the assignment to Beckerman
and, therefore, Beckerman can have no greater rights than those
possessed by Starter.

        After careful scrutiny of the affidavits and all documents
provided by the parties, the Court agrees with Hidary and
Official Starter that the Trademark Assignment Agreement

---

        [12]  Hidary also argues that Starter was on notice that
royalties were paid for only a portion of July 1999 since the
last statement indicated that it was for less than a month, and,
in fact, no further royalties were ever paid thereafter.

        [13]  See Deposition Testimony of Letendre at 13-14.

17

transferred to Official Starter the right to collect all unpaid
royalties due on or after July 29, 1999.  Not only did Starter
transfer all rights in the trademarks to Official Starter by
virtue of this Agreement, in plain and unambiguous language, it
gave Official Starter the right to "all income, royalties,
damages or payments due" on or after July 29, 1999.  There was no
exception carved out for licensees' unpaid royalties on goods in
process or inventory on hand as of the date Starter filed for
bankruptcy.  Had the parties intended to reserve these specific
royalties for the bankruptcy estate, they could have so provided,
but they did not.  Instead, they unequivocally assigned to
Official Starter all rights to royalty payments after July 29,
1999.  Having done so, Starter possessed no remaining rights to
royalty payments after July 29, 1999, that could have been
assigned to Beckerman.  "If the language of a contract is clear
and unambiguous, the contract is to be given effect in accordance
with its terms." RLI Ins. Co. v. Hartford Accident and Indem.
Co., 980 F.2d 120, 122 (2d Cir. 1992).

    Beckerman places great weight on the fact that the licenses
were not part of the Asset Purchase Agreement.  Although the
licenses themselves were not part of the Purchased Assets, there
was no need for them to be.  All trademarks were assigned to
Official Starter; Starter rejected the licenses under section 365
of the Bankruptcy Code; and all rights to royalties were

18

transferred to Official Starter.

Under § 365(g) of the Bankruptcy Code, the rejection of a contract not previously assumed constitutes a breach.  In re Lavigne, 114 F.3d 379, 387 (2d Cir. 1997).  The breach is deemed to occur on the day prior to the Debtor's filing for bankruptcy.  See Bridgeport Jai Alai, Inc. v. Autotote Systems, Inc., 215 B.R. 651, 657 (Bankr. D. Conn. 1997).  While rejection is treated as a breach, it does not completely terminate the contract.  In re Lavigne, 114 F.3d at 387; Bridgeport Jai Alai, 215 B.R. at 657. It frees the estate from the obligation to perform and gives the non-debtor party to the contract the right to treat his claim as a pre-petition claim, thus giving the non-debtor party his proper priority.  Lavigne, 114 F.3d at 387; Bridgeport Jai Alai, 215 B.R. at 657.  The Bankruptcy Code, however, does not determine the parties' rights regarding the contract and subsequent breach.  To determine those rights, the Court must look to state law.  Lavigne, 114 F.3d at 387.

Under Connecticut law, a party is relieved of continued performance under a contract if the breach is material.  See Bernstein v. Nemeyer, 213 Conn. 665, 672-73 (1990); Vesce v. Lee, 185 Conn. 328, 334 (1981); Restatement (Second) of Contracts § 237.  A material breach has been defined as one that would justify the other party to suspend his own performance of the contract.  12 Williston on Contracts § 1469 at 186 (3d. ed.

1970). The Connecticut Supreme Court has held that it is appropriate to look to "the multi-factor standards for materiality of breach contained in the Restatement (Second) of Contracts § 241 (1981)," Bernstein, 213 Conn. at 672, which provides:

> In determining whether a failure to render or to offer performance is material, the following circumstances are significant:
>
>    (a) the extent to which the injured party will be deprived of the benefit which he reasonably expected;
>
>    (b) the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived;
>
>    (c) the extent to which the party failing to perform will suffer forfeiture;
>
>    (d) the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances;
>
>    (e) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing.

Although Beckerman argues that the breach was not material, the Court has difficulty understanding how the rejection of a trademark licensing agreement, followed by the sale of the trademarks, could not be considered a "material" breach when it deprived the licensee of the ability to sell authorized goods bearing the trademark absent the new owner's consent to the

20

licensee's use of the trademark.  Applying the factors of the
Restatement, the Court finds that the breach was material and
that Hidary was relieved of its obligation to sell off the
inventory and goods in process and to remit to Starter royalties
thereon.

The fact that Official Starter also provided Starter with a
Non-Exclusive License Agreement to use the trademarks to sell
inventory in its outlet stores and in connection with inventory
and goods that it received does not detract from the assignment
of the trademarks and royalties to Official Starter under the
Trademark Assignment Agreement.  The Non-Exclusive License
Agreement expressly stated that it was solely for these limited
purposes and was for a limited period of time.  Although the
Agreement referenced inventory and goods in process held by
Starter and its affiliates, there is no mention of inventory and
goods in process held by Starter's licensees.  Indeed, Starter's
licensees, including Hidary, were not parties to this Agreement.
Moreover, and perhaps most importantly, the Non-Exclusive License
Agreement had expired prior to the assignment to Beckerman and
expressly provided that it was not assignable.

Beckerman also argues that this Court should not ignore the
remedies contemplated by paragraph 20 of the Hidary License
Agreement, which would have required Hidary to pay to the
bankruptcy estate royalties on all sales of inventory and goods

21

in process for a period of 120 days.  Thereafter, all authorized products, at Starter's election, had to be sold to Starter or destroyed.  Beckerman asserts that, under the Non-Exclusive License Agreement, Starter would have been able to sell this inventory and goods in process.  Where this argument misses the mark, however, is that Starter never advised Hidary of its election to purchase this inventory for subsequent resale.  Instead, it simply rejected the trademark licenses, thus relieving the licensees from any further obligation to perform under these agreements.

Accordingly, the Court finds that through the Trademark Assignment Agreement, Official Starter acquired all rights to royalties after July 29, 1999.  As of the date of the bankruptcy estate's assignment to Beckerman, Starter had no further right to royalty payment and, thus, no claims in this regard were assigned to Beckerman.

With respect to Beckerman's claim for promotional fees, under the Hidary License Agreement, this money was required to have been expended during the calendar year and if Hidary failed to spend the requisite two percent (2%) on advertising, on demand by Starter, this money had to be paid to Starter to use for advertising Starter products.  Hidary maintains that it expended the required two percent (2%).  However, even if the exact amount is incorrect, there never was a demand from Starter, and Starter,

which was winding down its affairs, was not in a position to expenc funds on advertising. Therefore, the Court finds that no additional monies were due to the bankruptcy estate for promotional fees.

Likewise, the Court finds that no further minimum guarantee payments were due to Starter. All minimum guarantee payments had been paid up to the date of that the Asset Purchase Agreement, and thereafter the right to royalty payments was transferred to Official Starter.

Last, Beckerman asks for an accounting. Having found that Beckerman is not entitled to any additional royalty payments, promotional fees, or minimum guarantee payments, the Court denies this request.

## Conclusion

Accordingly, the Court GRANTS the Motion for Summary Judgment [Doc. # 44] of Hidary and Official Starter and DENIES the Motion for Summary Judgment [Doc. # 48] of Beckerman. The Clerk is directed to close this file.

SO ORDERED, this ___31st___ day of March, 2005, at Bridgeport, Connecticut.


_____/s/ William I. Garfinkel_____
William I. Garfinkel,
United States Magistrate Judge


23